# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

PHILIP GIORDANO,
      Petitioner,

      v.

UNITED STATES OF AMERICA,
      Respondent.

No. 3:11-cv-9 (SRU)

## RULING ON MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE

The petitioner, Philip Giordano, seeks to vacate and correct his sentence pursuant to 28 U.S.C. § 2255. Giordano is confined at Federal Correctional Institution Tucson, in Tucson, Arizona. Giordano's section 2225 petition, filed on January 4, 2011, raises numerous grounds for relief, stemming primarily from assertions that Andrew Bowman, his attorney at trial and on direct appeal, rendered constitutionally ineffective assistance and that the sentence imposed by the court was unconstitutional. *See* Pet'r's Mot. to Vacate, Set Aside or Correct Sentence, *Giordano v. United States*, No. 3:11-cv-9 (SRU), ECF No. 1. On December 2, 2011, Giordano filed an amended petition, raising additional grounds for relief. *See* Pet'r's Am. Mot. to Vacate, *Giordano v. United States*, No. 3:11-cv-9 (SRU), ECF No. 77/84.[1] For the reasons discussed below, Giordano's section 2255 petition is DENIED.

## I.      Background

Giordano is a former mayor of Waterbury, Connecticut. The conviction and sentence that he challenges arose out of an unrelated investigation into potential political corruption in the City of Waterbury during his tenure as mayor. The government received reports from a confidential informant that Giordano had received cash from a reputed member of the Genovese

---

[1] ECF No. 77 is Giordano's redacted amended motion to vacate, set aside or correct his sentence, and ECF No. 84 is the un-redacted version filed under seal.

La Cosa Nostra family, whose construction firm was awarded several city contracts while Giordano was mayor.  The confidential informant, referred to throughout this decision as "CW-1," had, at one point, been Giordano's chief of staff and had worked on both his mayoral campaigns and his 2000 campaign for United States Senate.  The two had a falling out during Giordano's Senate campaign and, depending on whether the petitioner or the government's account is to be credited, Giordano either fired CW-1 or CW-1 left his job voluntarily.

CW-1's conduct during his time on Giordano's staff generated a fair amount of controversy due to his management (or mismanagement) of funds and prompted an investigation by the Waterbury Police, at Giordano's request.  The Waterbury Police investigation, however, cleared CW-1 of any criminal wrongdoing.  The affidavit supporting the government's wiretap request relied upon information provided by CW-1, but did not mention either the potential wrongdoing on CW-1's part or CW-1's acrimonious relationship with Giordano.  William S. Reiner, Jr., the FBI agent who prepared the affidavit, independently corroborated some but not all of the information provided by CW-1.

In February 2001, the government obtained an *ex parte* order from U.S. District Judge Alan H. Nevas authorizing interception of Giordano's phone communications pursuant to the federal wiretap statute, 18 U.S.C. §§ 2510-2520 ("Title III").  Between February and July 2001, the government monitored Giordano's city-issued cell phones, renewing its Title III application every thirty days and submitting periodic progress reports to the district court.

In the course of its corruption-related surveillance, the government intercepted 151 calls on Giordano's cell phones to or from Guitana Jones, then a prostitute with whom Giordano had a long-term sexual relationship.  One of those calls, placed on July 9, 2001, suggested that Jones was bringing a nine-year-old girl to Giordano for sex.  In another, on July 12, 2001, Giordano

asked Jones whether she would bring over the nine-year-old or another female whose age was not discussed.  The girls – referred to as V1 and V2 throughout the criminal proceedings and this ruling – were Jones' nine-year old daughter ("V1") and eleven-year old niece ("V2").

On the afternoon of July 12, after reviewing the contents of those calls, the government had an undercover police officer call Giordano's cell phone and leave an anonymous, threatening message indicating that the caller knew about Giordano's activities with the victims and would reveal Giordano's actions to the media if he continued.  The next day, July 13, 2001, the government intercepted a call between Giordano and Jones in which they discussed the message and who might have left it.  During the call, Jones assured Giordano that no one knew about Giordano's activities with V1 and V2.  She emphasized that the girls had revealed nothing, because Jones "got them to the point where they're scared, if they say somethin' they're gonna get in trouble."

On July 20, 2001, the government filed a criminal complaint against Jones charging her with violations of 18 U.S.C. §§ 371 and 2425 and obtained a warrant for her arrest.  The next day, July 21, 2001, state authorities removed V1 and V2 from Jones' household.  Jones was also arrested that day, after investigators saw her collecting $200 in cash from Giordano's mailbox. Earlier that day, Jones had successfully exploited Giordano's concern regarding the anonymous phone call by informing Giordano that the caller was a driver who knew about the abuse and was demanding hush money.   After her arrest, Jones assisted the FBI in its efforts to apprehend Giordano by calling him and telling him that the driver was demanding more hush money, and arranging an in person meeting on July 23, 2001.

The meeting occurred on July 23 as scheduled and Giordano gave Jones $500 in cash. After that exchange, agents approached Giordano and informed him that they had evidence of his

sexual misconduct and political corruption.  Over the next seventy-two hours, Giordano cooperated with the agents in the ongoing investigation of other targets of the corruption investigation.  Giordano was arrested on July 26, 2001.

On September 12, 2001, a federal grand jury returned a fourteen-count indictment against Giordano and Jones.  The indictment charged Giordano with two counts of violating the civil rights of V1 and V2 under color of law, in violation of 18 U.S.C. § 242; one count of conspiring with Jones to transmit knowingly the names of V1 and V2 by using facilities and means of interstate commerce with intent to entice, encourage, offer and solicit criminal sexual activity, in violation of 18 U.S.C. §§ 371 and 2425; and eleven counts of substantive violations of 18 U.S.C. § 2425, each alleging a particular transmission via telephone of the name of V1 and/or V2 with intent to entice, encourage, offer and solicit illegal sexual activity.  Jones pleaded guilty to several counts of the indictment on September 10, 2002, and entered into a written cooperation agreement.  On January 16, 2003, the grand jury returned a superseding indictment against Giordano adding four additional counts of substantive violations of section 2425.

Prior to his trial, Giordano moved to dismiss the original indictment on several grounds, asserting: (1) the counts alleging violations of 18 U.S.C. § 2425 failed to state federal offenses, because section 2425 only applies to interstate telephone calls and the calls between Giordano and Jones were all placed and received in Connecticut; (2) V1 and V2 did not have a federally protected right to be free of "aggravated sexual abuse and sexual abuse," because that right can only exist within the special maritime and territorial jurisdiction of the United States or where the defendant has crossed state lines to commit such sexual abuse; (3) he did not "act under color of law" in allegedly committing acts that otherwise violated 18 U.S.C. § 242; and (4) the charges

against him lacked the constitutionally required specificity.  Judge Nevas denied that motion in its entirety.  *United States v. Giordano*, 260 F. Supp. 2d 477 (D. Conn. 2002).

Giordano also moved Judge Nevas to disqualify himself from deciding a motion to suppress the wiretap evidence, because Judge Nevas had presided over the wiretap that Giordano was challenging.  Judge Nevas denied that motion and Giordano sought a writ of mandamus in the Second Circuit, which denied Giordano's mandamus petition by unpublished order.  *See In re Giordano*, No. 02–3095 (2d Cir. June 3, 2002).  Giordano then filed a second motion for recusal, on the grounds of bias.  Judge Nevas denied that motion as well.  *See United States v. Giordano*, No. 3:01-cr-216 (AHN), 2002 WL 32086481 (D. Conn. Nov. 14, 2002).

Finally, Giordano moved to suppress the evidence discovered as a result of the wiretap and also requested a *Franks* hearing.  Judge Nevas denied both the motion to suppress and the request for a *Franks* hearing.  *United States v. Giordano*, 259 F. Supp. 2d 146 (D. Conn. 2003).

The federal authorities had shared information regarding the alleged sexual abuse of V1 and V2 with Connecticut state authorities.  The state decided to take action and, as a result, Giordano was facing state sexual assault charges concurrently with the federal charges.  Prior to Giordano's federal trial, his attorney attempted to negotiate a global settlement with state and federal authorities.  Giordano did not accept the terms of the settlement and opted to go to trial.

Judge Nevas presided over Giordano's federal jury trial from March 12 to March 24, 2003. The heart of the government's case was the intercepted phone calls and the testimony of Jones, V1 and V2, and, to some extent, the drivers who took Jones and the girls to see Giordano. The government introduced 133 of the 151 wiretapped phone conversations between Giordano and Jones, several of which explicitly reference Jones "bringing" V1, V2 or both to Giordano. The government also presented expert evidence showing that that all of the calls were made on

phones capable of transmitting phone signals between states and that the actual calls described in counts four through nine of the indictment (though not the other calls) necessarily were routed through a switching center in White Plains, New York.

Jones testified that she met Giordano well before his 1995 election to the mayor's office, when Giordano was a lawyer in private practice, and that she frequently had sex with Giordano in exchange for money, which she used to support her addiction to crack cocaine. Jones testified that in the summer of 2000, Giordano asked Jones to bring "young girls" to perform sexual services and that she brought several girls between the ages of fourteen and sixteen, including a niece, to perform oral sex on Giordano. In November of 2000, Giordano indicated that he wanted V1, who was then only eight years old, to perform oral sex on him. Jones testified that she initially said "no," but that she brought V1 to Giordano's law office a few days later and instructed her to touch Giordano's penis until he ejaculated.

Several days later, Jones brought both V1 and V2, who was then ten years old, to Giordano's law office, where Jones performed oral sex on Giordano in the girls' presence. During the next visit, V1 performed oral sex on Giordano. After that episode, Jones testified that the victims began to perform oral sex on Giordano with regularity, usually at Giordano's law office but occasionally elsewhere, including several times in the Mayor's office at City Hall and in Giordano's official city car.

Jones testified that Giordano repeatedly and consistently warned her not to tell anyone about the abuse and to make sure the girls did not say anything either. Giordano threatened that Jones would go to jail if anyone found out. Jones testified that Giordano also repeatedly and consistently told the girls that they needed to remain silent, or else they would "get in trouble"

and Jones would go to jail.  Jones testified that she was afraid of going to jail, so she kept quiet and made sure the victims did as well.

V1 and V2 testified at trial via closed-circuit television from another room, in which the government's attorney and defense counsel were present. Their testimony substantially corroborated Jones' concerning the nature of the acts they performed, the places they performed the acts, and the warnings they received from Jones and Giordano.  The victims both testified that they did not tell anyone about the abuse because they feared Giordano.  V2, who was twelve at the time of the trial, testified that she was afraid "[b]ecause I didn't know what a mayor was and I was afraid, because he had money and I was afraid he could have someone hurt my family and I was afraid he own everybody."  She "thought the Mayor could rule people, like be their boss" and believed, based on Jones' and Giordano's warnings and threats, that Giordano "would have someone hurt my family or that either I would get in trouble" if she revealed the abuse.  V2 testified that the abuse hurt her physically and emotionally.

V1, who was ten at the time of the trial, testified that she understood that the mayor's job was to "[p]rotect the city" and "[w]atch[ ] over us, like God."  V1 could not remember whether Giordano told her not to tell anyone about the abuse but testified that, like V2, she did not tell anyone about the abuse because she feared Giordano and "thought he had power."  V1 believed she "would get put in jail" if she told anyone and also thought her mother, Jones, would beat her.

Although Jones and the victims testified that both victims performed oral sex on Giordano in various places, the FBI's DNA expert testified that neither of the victims' DNA was found at the search scenes.  Additionally, the victims' testimony contained some inconsistencies and inaccuracies.  For example, one of the victims testified that Giordano had a tattoo on his

ankle, which was incorrect, and V2 testified that Giordano did not have any body hair, which was also incorrect.

Giordano testified in his own defense at his trial.  He admitted to paying Jones for sex beginning at some point prior to February of 1993 and to having "occasional" sexual contact with her from that time until his arrest.  According to Giordano, Jones sometimes brought children, including V1 and V2, with her to the law office when she went there to perform oral sex on him.  Giordano admitted that he sometimes asked V1 and V2 to come with Jones to his office, but testified that he and Jones would leave them in a sunroom several rooms removed from his office while Jones performed oral sex on him.  Giordano testified that he "reluctantly agreed" to Jones' suggestion that she perform oral sex on him in V1 and V2's presence on a handful of occasions, but denied having any sexual contact of any kind with either V1 or V2 or with Jones' 16-year-old niece.  Giordano testified that none of the intercepted calls referencing V1 and/or V2 resulted in their accompanying Jones; the girls did not come to his law office at all during the period when his calls were being monitored.

Giordano moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure at the close of the government's case in chief and again at the close of trial.  Both motions were denied. The jury convicted Giordano on all counts of the indictment except one of the section 2425 charges.  After trial, Giordano again moved for a judgment of acquittal, renewing the arguments that the district court previously had rejected.  Judge Nevas denied Giordano's motion.  *United States v. Giordano*, 324 F. Supp. 2d 349, 352–53 (D. Conn. 2003).  On June 13, 2003, Judge Nevas sentenced Giordano to a total of 444 months' imprisonment.  After his conviction on the federal charges Giordano pleaded guilty to the state charges.  He was sentenced to eighteen years in state custody, to run concurrently with his federal sentence.

Giordano appealed his conviction and sentence.  The Second Circuit affirmed by published decision and unpublished order.  *See United States v. Giordano*, 442 F.3d 30 (2d Cir. 2006); *United States v. Giordano*, 172 F. App'x 340 (2d Cir. 2006).  The Court held, in relevant part: (1) Giordano's intrastate use of a telephone satisfied the jurisdictional element of section 2425 and section 2425 did not exceed Congress' authority under the Commerce Clause; (2) there was sufficient evidence that Giordano acted under color of law; (3) Judge Nevas was not required to recuse himself from ruling on the motion to suppress evidence obtained from the wiretap and did not err in denying Giordano's motion for recusal on the ground of bias; (4) Judge Nevas could lawfully amend a wiretap authorization under 18 U.S.C. § 2517(5) to allow the use of evidence of crimes not specified at 18 U.S.C. § 2516 and the government acted in good faith and "as soon as practicable" under § 2517(5) in requesting to amend the wiretap and adhered to the minimization requirements of 18 U.S.C. § 2518(5); (6) Judge Nevas did not err in denying Giordano's motion for a *Franks* hearing, because there was insufficient evidence that the agent who procured the warrant did so with knowledge of or with reckless regard to the falsity of the affidavit supporting the warrant; (7) Judge Nevas did not err in permitting V1 and V2 to testify remotely, via closed-circuit television and expert testimony was not required in order for Judge Nevas to find that the victims were unable to testify in person due to fear; (8) none of the evidentiary rulings that Giordano challenged on appeal amounted to an abuse of discretion, including but not limited to the decision to prohibit cross-examination of the victims regarding past sexual activity under Federal Rules of Evidence 402, 403 and 412(b)(1); and (9) the computation of Giordano's sentence under the United States Sentencing Guidelines ("Sentencing Guidelines") was not erroneous.

The Second Circuit ordered a limited remand pursuant to *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), for Judge Nevas to determine whether he would have imposed a materially different sentence if the Sentencing Guidelines had been advisory at the time Giordano was sentenced.  Giordano appealed the Second Circuit's ruling to the United States Supreme Court.  The Supreme Court denied certiorari on February 20, 2007.  *Giordano v. United States*, 549 U.S. 1213 (2007).

On remand, Judge Nevas held that he would not have imposed a materially different sentence had the Sentencing Guidelines been advisory.  *United States v. Giordano*, No. 3:01-cr-216 (AHN), 2007 WL 2261684, at *1 (D. Conn. Aug. 6, 2007).  The Second Circuit affirmed.  *United States v. Giordano*, 340 F. App'x 751 (2d Cir. 2009).  The Supreme Court denied certiorari on January 11, 2010.  *Giordano v. United States*, 558 U.S. 1138 (2010).  This timely section 2255 petition followed.

## II.    Standard of Review

In order to support a claim for relief under section 2255, a petitioner must establish that his "sentence was imposed in violation of the Constitution or Laws of the United States."  28 U.S.C. § 2255.  "As a general rule, 'relief is available under § 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law that constitutes a fundamental defect which inherently results in a complete miscarriage of justice.'"  *Napoli v. United States*, 32 F.3d 31, 35 (2d Cir. 1994) (quoting *Hardy v. United States*, 878 F.2d 94, 97 (2d Cir. 1989)).  The standard is a high one; even constitutional errors will not be redressed through a writ of habeas corpus unless they have had a "substantial and injurious effect" that results in "actual prejudice" to the petitioner.  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (internal citations omitted).

A federal prisoner may not use a section 2255 petition to relitigate questions that were expressly or impliedly resolved during a direct appeal, absent "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *United States v. Becker*, 502 F.3d 122, 127 (2d Cir. 2013) (internal citations omitted); *see also United States v. Sanin*, 252 F.3d 79, 83 (2d Cir. 2001); *United States v. Munoz*, 143 F.3d 632, 637 (2d Cir. 1998) ("A motion under § 2255 is not a substitute for an appeal.").  A petitioner is also barred from bringing a claim on habeas review that was not properly raised on direct review unless the petitioner is able to show "cause and actual prejudice" or "actual innocence."  *See Bousley v. United States*, 523 U.S. 614, 622 (1998); *Reed v. Farley*, 512 U.S. 339, 354 (1994).

A petitioner may raise a claim of ineffective assistance of counsel that was not raised previously at trial or on appeal.  *Strickland v. Washington*, 466 U.S. 668 (1984); *see also Massaro v. United States*, 538 U.S. 500, 504 (2003).  That does not mean, however, that every perceived error or questionable decision by counsel entitles a petitioner to relief.  There is a "strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance."  *Strickland*, 466 U.S. at 689.  The threshold for an ineffective assistance claim is high, and courts have "declined to deem counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox, or downright ill-advised."  *Tippins v. Walker*, 77 F.3d 682, 686 (2d Cir. 1996). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."  *Harrington v. Richter*, 562 U.S. 86, 88 (2011) (citing *Strickland*, 466 U.S. at 690).

Under *Strickland*, to prevail on an ineffective assistance claim, a defendant must

demonstrate both: (1) that his counsel's performance "fell below an objective standard of reasonableness," and (2) that "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687-88.  To satisfy the performance prong, the petitioner must show that counsel's performance was "outside the wide range of professionally competent assistance." *Id.* at 690. To satisfy the prejudice prong, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*  Thus, the mere possibility that a particular deficiency might have prejudiced the defendant does not warrant relief.

Under section 2255, a petitioner is entitled to a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b).  "Mere generalities or hearsay statements will not normally entitle the applicant to a hearing . . . .  The petitioner must set forth specific facts which he is in a position to establish by competent evidence." *Dalli v. United States*, 491 F.2d 758, 760-61 (2d Cir. 1974) (citations omitted).  In the absence of supporting facts, the court may resolve a petitioner's ineffective assistance of counsel claims without a hearing.  *See id.*  Moreover, even where a hearing is warranted, a full testimonial hearing may not be required.  *See Chang v. United States*, 250 F.3d 79, 85 (2d Cir. 2001) (citing *Machibroda v. United States*, 368 U.S. 487, 495 (1962)).

In some cases, it may be "perfectly appropriate," "for the district court to proceed by requiring that the record be expanded to include letters, documentary evidence, and, in an appropriate case, even affidavits," in lieu of a full-blown evidentiary hearing.  *Id.*  District courts have discretion to choose such a "middle road," in cases where it will avoid or at least minimize "delay, the needless expenditure of judicial resources, the burden on trial counsel and the

government, and perhaps the encouragement of other prisoners to make similar baseless claims that would have resulted from a full testimonial hearing." *See id.*

## III. Discussion

Giordano's section 2255 petition enumerates nearly thirty grounds for concluding that Andrew Bowman, his attorney at trial and on direct appeal, provided constitutionally ineffective assistance under *Strickland*. Giordano also claims that newly discovered evidence that he is not the father of one of the victims likely would have produced an acquittal, that a change in the law would have vitiated his convictions under 18 U.S.C. § 2425, and that his Fifth and Sixth Amendment rights to a fair trial were violated in various ways. Many of Giordano's claims were raised on direct appeal. Absent "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice," those claims are procedurally barred. *Becker*, 502 F.3d at 127. For the reasons discussed, Giordano's remaining non-barred claims fail as well.

### A. Procedurally Barred Claims

Giordano asserts several claims in his section 2255 petition that were litigated on direct appeal. Giordano recognizes that claims raised on direct appeal may not be relitigated in habeas proceedings, yet attempts to avoid the procedural bar by arguing that the law has changed or the Second Circuit wrongly decided the issues. He also contends that Attorney Bowman "ineffectively" raised and/or the Second Circuit failed to "fairly consider" some of the relevant issues. Giordano, however, fails to establish an "intervening change of controlling law" or any new evidence, and none of his claims evidence a "need to correct a clear error or prevent manifest injustice." *Becker*, 502 F.3d at 127; *Sanin*, 252 F.3d at 83; *Munoz*, 143 F.3d at 637.

1. *Jurisdiction under 18 U.S.C. § 2425*

Giordano was convicted of conspiring with Jones to violate and of violating 18 U.S.C. § 2425, which prohibits, in relevant part, the use of facilities or means of interstate commerce to initiate the transmission of identifying information of a minor under sixteen years old "with the intent to entice, encourage, offer, or solicit any person to engage in any sexual activity for which any person can be charged with a criminal offense." Giordano was charged with using a cellular phone (and Jones with using a landline) to initiate the knowing transmission of the name of either V1 or V2 or both with the intent to solicit, entice, encourage, and offer them to engage in sexual activity. Giordano challenged his convictions under section 2425 in his motion for judgment of acquittal, arguing that a telephone's ability to cross state lines was not sufficient to invoke federal jurisdiction when the calls in question were intrastate. *See Giordano*, 324 F. Supp. 2d at 352-53. Judge Nevas rejected that argument and Giordano appealed.

On direct appeal, Giordano claimed that he did not violate section 2425, because both he and Jones were physically located in Connecticut when all of the calls were made; thus their telephones were not "facilities or means of interstate . . . commerce." *See Giordano*, 442 F.3d at 38. In the alternative, he argued that if section 2425 reaches intrastate telephone calls, then the statute is unconstitutional, because Congress lacks the power to regulate "intrastate calls" under the Commerce Clause. *Id.* (citing *Jones v. United States*, 529 U.S. 848 (2000); *United States v. Morrison*, 529 U.S. 598 (2000); *United States v. Lopez*, 514 U.S. 549 (1995)).

The Second Circuit rejected both arguments, holding that section 2425 unambiguously reaches the intrastate use of a telephone and that Congress did not exceed its Commerce Clause powers in enacting section 2425. *Id.* at 40-42. The intrastate use of

a telephone to transmit the name of a minor involves the use of a "facility or means" of interstate commerce, because the national telephone network is a "facility of interstate . . . commerce." *Id.* at 39-40 (internal citations omitted).  Moreover, "Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." *Id.* at 41 (citing *Lopez*, 514 U.S. at 558-59).  *Lopez*, *Morrison* and *Jones* involved statutes falling within a different category of Commerce Clause power, and thus had no bearing on the constitutionality of section 2425.  *Id.*

Having litigated and lost his challenges to the proper interpretation and constitutionality of section 2425 on direct appeal, Giordano is barred from raising those claims again in section 2255 petition.  Giordano attempts to avoid the procedural bar, however, by asserting that Judge Nevas' decision is no longer good law in light of the Tenth Circuit's decision in *United States v. Schaefer*, 501 F.3d 1197 (10th Cir. 2007), *overruled in substantial part by United States v. Sturm*, 672 F.3d 891 (10th Cir. 2012).  Giordano claims that he failed to raise this argument on direct appeal because the Tenth Circuit's decision was rendered several years after his conviction.

Giordano's argument is wholly without merit.  *Schaefer* involved a different statute – 18 U.S.C. § 2252(a) – and different statutory language.[2]  Moreover, a Tenth Circuit decision is not an intervening change of law binding on Judges in this district, and a Tenth Circuit decision that largely has been overruled has little persuasive value whatsoever.  The law in this Circuit is clear, and Giordano is not entitled to relief.

---

[2] The issue in *Schaefer* was whether the mere connection to the Internet established the jurisdictional nexus under section 2252(a).  The Tenth Circuit held that it did not, because "[t]he plain language of §§ 2252(a)(2) and (a)(4)(B) speaks of movement in commerce, and giving the words used their ordinary meaning this signifies a movement between states." *Schaefer*, 501 F.3d at 1201 (internal citations and quotation marks omitted).

2. *"Color of Law" under 18 U.S.C. § 242*

Giordano was also convicted of two counts of violating 18 U.S.C. § 242, which "mak[es] it criminal to act (1) 'willfully' and (2) under color of law (3) to deprive a person of rights protected by the Constitution or laws of the United States." *United States v. Giordano*, 442 F.3d 30, 42-47 (2006). The first count charged Giordano with depriving V1, who had not yet attained twelve years of age, of her Fourteenth Amendment right to be free from sexual abuse by touching her genitals and breasts and by coercing and forcing her to engage in fellatio and genital contact with him. The second count charged the same with respect to V2.

Giordano challenged his convictions under section 242 on direct appeal, arguing primarily that there was insufficient evidence that he had acted under "color of law." He emphasized that the evidence at trial demonstrated that Jones was a drug addict who engaged in prostitution in order to support her drug habit and that Jones brought the girls to Giordano for the same reason. Thus, even if the government adequately proved that Giordano had sexual contact with the victims, no rational trier of fact could have concluded that the sexual contact was made possible only because Giordano was cloaked with the authority of the office of Mayor. *See* Defendant-Appellant's Reply Br., *United States v. Giordano*, No. 03-1394, 2004 WL 5151463 (Sept. 2004). The Second Circuit rejected that argument, holding that Giordano's understanding of the law was incorrect and the facts supported his conviction. *Giordano*, 442 F.3d at 42.

Giordano's section 2255 petition again contends that there was insufficient evidence that he acted "under color of law," i.e., that if the sexual abuse occurred it was "made possible only because [he was] cloaked with the authority of state law." Am. Mot. to Vacate at 6-7, 22, 26 (citing *United States v. Classic*, 313 U.S. 299, 325-26 (1941)); Pet'r's Mot. for Evidentiary Hr'g at 2, *Giordano v. United States*, No. 3:11-cv-9 (SRU), ECF No. 171 (same). The thrust of

16

Giordano's reasoning, once again, is that if any abuse occurred, it did not occur solely due to his status as the mayor, because Jones was largely if not completely responsible for forcing the victims to engage in sexual contact with Giordano.  The "but for" causation required by *Classic* was therefore absent, and his convictions resulted in a "fundamental miscarriage of justice." Am. Mot. to Vacate at 26.

Giordano's section 2255 petition also asserts claims of ineffective assistance of counsel arising from or related to whether he acted under "color of law."  Specifically, Giordano contends that Attorney Bowman was ineffective for: (1) failing to interview Jones' 16-year-old niece – referred to in this ruling as "RM" – and failing to procure relevant Department of Children and Families ("DCF") records, both of which would have demonstrated that Jones repeatedly subjected minor females in her family to sexual exploitation in return for money to support her drug habit; and (2) failing to object to the exclusion of the word "only" in the jury instructions, which was plain error.[3]

As Giordano acknowledges, the Second Circuit squarely addressed his "color of law" arguments on direct appeal and rejected his interpretation of *Classic*. *Giordano*, 442 F.3d at 42. The Second Circuit determined that the meaning of the phrase "under color of law" in section 242 was "more expansive" than Giordano maintained.  *Id.  Classic* covers a broad range of conduct; it is not necessary for the crime to occur in the course of official business or to be connected with the perpetrator's office.  *Id.* at 42-43.  Moreover, contrary to Giordano's assertions, the word "only" in that decision refers to the perpetrator's misuse of power, not his

---

[3] Giordano further claims that defense counsel was ineffective for failing to challenge the government's evidence concerning his use of the trappings of his office – specifically his police badge – to procure sex.  As the government points out, however, Giordano himself challenged the government's evidence in his own testimony by asserting that he never used or carried his badge, and his counsel challenged the government witnesses' assertions to the contrary. *See* Gov't Resp. to Am. Mot. to Vacate at 89-90, *Giordano v. United States*, No. 3:11-cv-9 (SRU), ECF No. 130.

access to the victim.  *See id.*  An official acts under color of law "when [his] misuse of official

power made the commission of a constitutional wrong possible, even though the official

committed abusive acts for personal reasons far removed from the scope of official duties."  *Id.*

at 44.  Applying that standard, the Second Circuit concluded that the evidence at trial "was more

than sufficient to allow a rational trier of fact to find the [color of law] element satisfied beyond a

reasonable doubt."  *Id.* at 42-46.

Giordano cites *United States v. Davis*, 417 U.S. 333 (1974), for the proposition that I may

review the Second Circuit's ruling in habeas proceedings.  *Davis*, however, does not grant

district courts license to review an appellate court decision in the absence of an intervening

change of law.[4]  Although Giordano's arguments with respect to the "color of law" requirement

were adopted by the dissent in the Second Circuit, I am bound by the majority opinion.

Giordano may disagree with the Second Circuit's interpretation of the law, but he presents no

facts or circumstances indicating that a "fundamental miscarriage of justice" occurred.  His

challenge to the "color of law" element of section 242 is procedurally barred and Giordano is not

entitled to relief in that regard.

The Second Circuit's interpretation of the "color of law" element of section 242 also

prevents Giordano from prevailing on the related claims of ineffective assistance of counsel.

With respect to the jury instructions, the language of the relevant instruction largely tracked

*Classic*, stating: "Misconduct made possible because the public official is clothed with the

authority of the law is action 'under color of law.'"  Gov't Resp. to Am. Mot. to Vacate at 101,

*Giordano v. United States*, No. 3:11-cv-9 (SRU), ECF No. 130 (citing Jury Instructions at 32).

---

[4] The issue in *Davis* was whether matters reviewed on direct appeal may be revisited in habeas proceedings if the intervening change in law relates to the "laws of the United States" rather than the Constitution.  The Supreme Court held that changes in both constitutional and statutory law are reviewable in a section 2255 petition.  *Davis*, 417 U.S. at 344-46.

"Only" is the sole missing word.  *See Classic*, 313 U.S. at 326.  Giordano perceives that omission as potentially dispositive, arguing it diminishes the strict "but-for" causation called for in *Classic*.

The failure to object to a jury instruction generally does not constitute "unreasonably deficient performance" under *Strickland* unless "the trial court's instruction contained 'clear and previously identified errors.'" *Aparicio v. Artuz*, 269 F.3d 78, 99 (2d Cir. 2001) (citing *Bloomer v. United States*, 162 F.3d 187, 193 (2d Cir. 1998). "[I]n order to show prejudice of the magnitude needed to support a claim of ineffective assistance of counsel," based on a failure to object to a jury instruction, a defendant must demonstrate "a reasonable probability that but for the failures to object, the jury would not have convicted him on some count on which it found him guilty." *Bennett*, 663 F.3d at 88.

Giordano points to no authority indicating that the exclusion of the word "only" from jury instructions on "color of law" renders the instructions erroneous.  He has therefore failed to demonstrate that any such error was "clear and previously identified," so as to render defense counsel's failure to object unreasonable.[5]  Regardless, Giordano cannot demonstrate prejudice. The Second Circuit rejected his interpretation of *Classic* and concluded that the evidence was more than sufficient for the jury to conclude that the abuse was "made possible only because [Giordano was] clothed with the authority of state law."  *Giordano*, 442 F.3d at 47 (internal citations and quotation marks omitted).  Thus, even if the omission of the word "only" was erroneous, Giordano cannot demonstrate that its inclusion would have been reasonably likely to produce an acquittal.  *See Bennett*, 663 F.3d at 88.

---

[5] It is not at all clear that exclusion of the word "only" even could have altered the meaning of the instructions in a manner that might have misled the jury.  The word "because" conveys a causal requirement and the remainder of the instruction on "color of law" explains that a person "does not act under 'color of law' when he acts solely within the ambit of his personal pursuits and there is no real nexus between the defendant's official duties and the conduct which gave rise to the alleged violations." Gov't Resp. at 101.

Giordano has likewise failed to show that Attorney Bowman was constitutionally ineffective for failing to interview RM or, to the extent the defendant did not already possess the relevant files, to obtain DCF records related to RM.  First, it is difficult to grasp how counsel might have been ineffective for failing to procure information about RM when RM was another underage individual with whom Giordano allegedly had sexual relations.  Whatever the extent of her knowledge about Jones' behavior and/or the victims' background, Giordano cannot possibly have contemplated calling RM as a witness at trial.  An attorney in defense counsel's position would have wanted to do everything in his power to keep out as much evidence about RM as possible.  If Bowman had attempted to rebut the "color of law" element using RM, the results almost certainly would have been devastating for Giordano.

 Second, in light of the Second Circuit's interpretation of the "color of law" element, any additional information contained in RM's DCF records would not have altered the outcome of the case. The DCF records may indicate, as Giordano asserts, that Jones "groomed" RM for sex by taking her to watch and later requiring RM to perform sexual acts herself.  Am. Mot. to Vacate at 6-7.  The records also may indicate that Jones threatened RM to prevent her from telling anyone about those activities.  *Id.*  That information, however, does not exculpate Giordano.

Jones readily admitted that she prostituted the victims and RM because she needed money for drugs.  *Giordano*, 442 F.3d at 45 n.20.  She also acknowledged her role in bringing the victims to Giordano and ensuring that they kept quiet.  *Id.* at 35-36 n.2.  Yet, Jones also testified that she did whatever Giordano asked and ensured that the girls did as well, because Giordano was the mayor and she feared the consequences if she did not.  *Id.*  The victims submitted to the abuse and kept quiet about it because they feared both Jones and Giordano.  *Id.*

at 45-46.  Crucially, they testified that they feared and obeyed Giordano *because* he was the mayor and they believed that he had the power to harm them and their families.  *See id.*

The Second Circuit recognized that Jones played a significant role in facilitating the abuse and acknowledged that in other circumstances, Jones might have shouldered primary responsibility.  *See id.* at 45 n.20. The "color of law" requirement, however, is concerned with whether the defendant "employs the authority of the state in the commission of the crime," not with whether the same crime could have been committed by an individual not cloaked with state authority.  *Id.* at 45 (citing *United States v. Walsh*, 194 F.3d 37, 41 (2d Cir. 1999)).  The Second Circuit affirmed Giordano's convictions, notwithstanding Jones' behavior and admitted role in the abuse, because there was sufficient evidence that the "misuse of [Giordano's] official power made the commission of a constitutional wrong possible."  *Id.* at 44. Thus, DCF files showing that Jones brought RM to other men would not undermine the conclusion that Giordano acted under color of law in sexually abusing V1 and V2.

### 3.  *Evidence of the Victims' Prior Sexual Activity under Rule 412*

Giordano next argues that Bowman was ineffective for failing to raise the constitutional due process violation caused by the disparate application of Rules 412 and 404(b) of the Federal Rules of Evidence.  Giordano contends that the government was unfairly "permitted to present copious extraneous evidence regarding the petitioner's penchant for women," while he was denied the opportunity to present evidence of V1 and V2's prior sexual activity.[6]  Giordano's brief also indicates that Bowman was ineffective for failing to obtain DCF records for V1 and V2

---

[6] Giordano also claims that counsel was ineffective for failing to request a limiting instruction or to appeal the admission of evidence relating to Giordano's "penchant for women."  Am. Mot. to Vacate at 22.  The record establishes that Attorney Bowman did appeal the admission of evidence related to Giordano's extramarital affairs. Gov't Resp. at 20 (citing Def.'s App. Br. at 96-104, *United States v. Giordano*, 172 F. App'x 340 (2d Cir. 2006)). The Second Circuit affirmed, dismissing all but two of Giordano's challenges to Judge Nevas' evidentiary rulings out of hand.  *Giordano*, 172 F. App'x at 343-44.

that would have demonstrated that the victims had previous sexual experience and knowledge of sexual terms, among other things.

Under Rule 412(a), evidence offered to prove that a victim engaged in other sexual behavior and evidence offered to prove a victim's sexual predisposition are generally inadmissible in a civil or criminal proceeding alleging sexual misconduct.  As relevant to this case, Rule 412(b)(1)(C) provides an exception for "evidence whose exclusion would violate the defendant's constitutional rights."   At trial, defense counsel attempted to introduce evidence of an alternative source of V1 and V2's sexual knowledge and Judge Nevas denied admission of that evidence.  The Second Circuit affirmed on direct appeal, noting that the source of V1 and V2's knowledge of sexual terms was not at issue in the case.  *Giordano*, 172 F. App'x at 344.  Thus, Giordano is procedurally barred from relitigating the issue in his section 2255 petition.

To the extent that the claims in his section 2255 petition are broader than the victims' "knowledge of sexual terms," Giordano presents no evidence that his constitutional rights to put on a defense and confront witnesses were violated.  *United States v. Alvarez*, No. 13-4259, 2015 WL 424326, at *2 (2d Cir. Feb. 3, 2015) (citing *Holmes v. South Carolina*, 547 U.S. 319, 324, (2006); *Davis v. Alaska*, 415 U.S. 308, 309 (1974)).  Whether or not the victims engaged in other sexual activity has no bearing on whether or not Giordano committed the crimes alleged.  This is not a case where the victims were raped and the defendant must show that there was an alternative source of semen or injury in order to put on a defense.  *See* Fed. R. Evid. 412(b)(1)(A).  Evidence of V1 and V2's "sexual proclivity" falls squarely within Rule 412(a)'s prohibition and excluding that evidence did not violate Giordano's constitutional rights.

    4.  *Recusal of Judge Nevas*

Giordano's moved Judge Nevas to recuse himself from deciding the defendant's motion

to suppress evidence obtained from the Title III wiretap, because Judge Nevas authorized and monitored the wiretap. Judge Nevas denied that motion and the Second Circuit affirmed. Giordano also unsuccessfully moved for recusal of Judge Nevas on the ground of bias, *see Giordano*, 2002 WL 32086481, at *3-4, and the Second Circuit affirmed that decision as well, *see Giordano*, 172 F. App'x at 345.

In his section 2255 petition, Giordano contends that Attorney Bowman failed to adequately prepare, argue and brief the first motion for recusal and failed to effectively present critical arguments before the Second Circuit. Specifically, Giordano argues that Bowman failed to raise "the most basic argument, that Judge Nevas was barred by Canon 3(c)(1)(A) of the Code of Judicial Conduct [from] presiding over a Motion to Dismiss that was based on Judge Nevas' initial monitoring." Am. Mot. to Vacate at 11.

Whether or not Bowman ought to have addressed Canon 3(c)(1)(A), there is no prejudice because Giordano's argument is foreclosed by the Second Circuit's ruling on his direct appeal. The Second Circuit, whose Judges are thoroughly aware of the Code of Judicial Conduct, held that "[t]he authorization of a wiretap under Title III does not 'evidence the degree of favoritism or antagonism required' to necessitate recusal under § 455(a) from ruling on the admissibility of the resulting evidence." *Giordano*, 442 F.3d at 48 (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)). The Court squarely confronted whether Judge Nevas was required to recuse himself from ruling on the motion and held that he was not. Thus, Giordano cannot prevail on an ineffective assistance of counsel claim in that regard.

Giordano's section 2255 petition also claims that Judge Nevas was biased against him and demonstrated that bias at trial by telling Giordano that he would impose a harsh sentence if Giordano testified on his own behalf. Giordano asserts that Bowman was ineffective for failing

to object to or otherwise effectively challenge Judge Nevas' bias.  It is true that Judge Nevas

warned Giordano that there might be consequences under the then-mandatory Sentencing

Guidelines if he testified on his own behalf and was found guilty, but nothing in the record

supports Giordano's assertion that Judge Nevas threatened him with a harsh sentence.[7]  *See* Trial

Tr. at 1643-44, *United States v. Giordano*, 3:01-cr-00216 (AHN).  To the extent that Giordano's

section 2255 petition revives his original claims of bias, his arguments are procedurally barred.

*See Giordano*, 172 F. App'x at 345.

> 5. *Interviews with Child Witnesses and Closed Circuit Testimony of Child Witnesses*

Giordano claims that defense counsel failed to adequately prepare, argue, and brief an

Objection to the Government's Motion for Order Allowing Child Witnesses to Testify by Closed

Circuit Television and failed to "effectively" raise that issue before the Second Circuit.  He

asserts the same with respect to a Motion to Prohibit Unmonitored Interviews of the Alleged

Child Victims in the Absence of a Court Monitor and in the Absence of the Defendant's Counsel

or Representative.  Am. Mot. to Vacate at 17-18.  The Second Circuit addressed the issues

together on direct appeal.  *See Giordano*, 172 F. App'x at 343.

Judge Nevas allowed V1 and V2 to testify remotely under 18 U.S.C. § 3509, which

permits an alleged child victim to testify via two-way closed circuit television if, inter alia, she is

unable to testify in court due to fear.  Giordano argues that allowing the victims to testify by

closed circuit television was prejudicial, because it indicated that Giordano caused them

"trauma," which necessarily implied that he was guilty.  Am. Mot. to Vacate at 17.  On appeal,

however, the Second Circuit held that the district court's factual findings satisfied the

---

[7] Giordano appealed his ultimate sentence as "substantively unreasonable."  The Second Circuit affirmed his 444-month sentence, noting that it was "at the upper end of the range of reasonableness for these offenses," but that Judge Nevas did not exceed that range.  *Giordano*, 340 F. App'x at 753.  The fact that Judge Nevas imposed a "substantively reasonable" sentence also undercuts Giordano's claims of bias.

requirements of *Maryland v. Craig*, 497 U.S. 836 (1990), the seminal case on the issue.

*Giordano*, 172 F. App'x at 343.  Giordano is therefore barred from challenging the propriety of

the victims' closed circuit testimony on habeas review.

Giordano's claim regarding the pre-trial interviews of the victims also lacks merit,

because the government's ability to interview the victims without an independent monitor or

defense counsel present did not impede Giordano's ability to present a defense.  Generally

speaking, a defendant may not access any statements or reports made by government witnesses

until the witness has testified on direct examination in the trial of the case.  *See* 18 U.S.C. §

3500(a); *see also United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001).  It therefore follows

that a defendant has no right to have counsel present in interviews of government witnesses or

otherwise dictate the terms of the interview.  The Second Circuit considered and rejected

Giordano's arguments on appeal, holding that neither Giordano's Fifth Amendment right to a fair

trial nor his Sixth Amendment right to confront witnesses was violated.  *Giordano*, 172 F. App'x

at 343 n.4.  Giordano "was permitted to and did elicit from the child victims on cross-

examination the fact that they had previously met with the government's attorney and were

familiar with the questions they would be asked at trial."  *Id.*  That was sufficient.[8]  *See id.*

---

[8] Giordano's section 2255 petition also claims that Judge Nevas prohibited defense counsel from interviewing the child victims.  The government disputes that contention and Giordano appears to abandon it in his reply brief.  *See* Gov't Resp. at 67; Pet'r's Reply at 20, *Giordano v. United States*, No. 3:11-cv-9 (SRU), ECF No. 147.  The reply brief argues instead that, assuming defense counsel had the ability to do so, it is "unfathomable" that he did not interview the girls in advance of the trial.  That failure, combined with the lack of access to the DCF records, ensured that Giordano was not fully apprised of the allegations and evidence against him until trial.  Frankly, that claim is preposterous.  Giordano was fully aware of the nature of the charges and the bulk of the evidence against him.  He might not have believed that the girls would go through with testifying, but that does not mean that he did not know what they might say.  As the Second Circuit noted, Giordano had the opportunity to cross-examine the victims regarding the fact that they had previously met with the government's attorney and were familiar with the questions they would be asked at trial.  *See Giordano*, 172 F. App'x at 343 n.4.  Defense counsel also highlighted inconsistencies in the girls' testimony on cross-examination and in his closing argument.  *See* Gov't Resp. at 85 (citing Trial Tr. at 2056, 2059).  Even if Giordano feasibly could have interviewed the victims before the trial, he was not prejudiced by his counsel's failure to do so because counsel anticipated what the victims might say and effectively highlighted the weaknesses of their testimony at Giordano's trial.

6.   *Sentencing and Resentencing*

Finally, Giordano alleges that defense counsel was constitutionally ineffective for failing to prepare an adequate sentencing memorandum or objections to the PSR and for failing to "effectively raise" those issues at sentencing.  Giordano also alleges that counsel failed to adequately prepare for Giordano's resentencing after the *Crosby* remand, which caused Judge Nevas to "rubber stamp" Giordano's original 444-month sentence, in violation of *Nelson v. United States*, 555 U.S. 350 (2009), *Kimbrough v. United States*, 552 U.S. 85 (2007), and *Rita v. United States*, 551 U.S. 338 (2007).

Attorney Bowman raised numerous objections to the PSR and strongly advocated for a downward departure from the Sentencing Guidelines, both in the defendant's sentencing memorandum and at sentencing.  *See* Gov't Resp. at 90-91 (citing Def.'s Sent. Mem. at 1-16, *United State v. Giordano*, 3:01-cr-216 (SRU), ECF No. 247).  He also vigorously challenged Giordano's 444-month sentence on direct appeal, raising "a host of challenges to the computation of his sentence under the Sentencing Guidelines."  *Giordano*, 172 F. App'x at 344. Giordano's section 2255 petition states that Bowman failed to adequately prepare a sentencing memorandum, adequately object to the PSR, or effectively appeal, but it does not list a single objection that Bowman should have but failed to raise or a single ground for downward departure that was omitted.  In the absence of any support for claims of ineffective assistance, Giordano's sentencing-related claims are procedurally barred, because he extensively challenged his sentence on direct appeal.

 Although the Second Circuit affirmed Giordano's sentence, it remanded under *Crosby* for a determination whether Judge Nevas would have imposed a materially different sentence had the Sentencing Guidelines been advisory.  Judge Nevas answered that question in the

negative, but contrary to Giordano's assertions, his ruling on remand was hardly a "rubber

stamp."  Judge Nevas issued a written decision listing the reasons that he would not have

imposed a materially different sentence under an advisory Guidelines regime.  Judge Nevas

noted that although the Sentencing Guidelines were mandatory at the time of Giordano's

sentencing, he was not bound by the guidelines due to the government's U.S. Sentencing

Guidelines Manual § 5K1.1 motion.  *United States v. Giordano*, No. CRIM. 3:01CR216AHN,

2007 WL 2261684, at *2 (D. Conn. Aug. 6, 2007), *aff'd sub nom. United States v. Giordano*, 340

F. App'x 751 (2d Cir. 2009).  Thus, he had "effectively treated the Guidelines as advisory" in

determining Giordano's original sentence and imposed a sentence that was "considerably below

the otherwise then-mandatory applicable Guidelines range of life imprisonment."  *Id.*

Judge Nevas nevertheless proceeded to conduct an analysis of the relevant issues to

determine whether a different sentence was warranted under an advisory Guidelines regime.  He

considered the section 3553(a) factors, the Sentencing Guidelines, the PSR and other relevant

portions of the record, and the arguments of counsel.  After examining that information, Judge

Nevas concluded that Giordano's sentence "was and still remains just, reasonable, and sufficient,

but not greater than necessary."  *Id.* at 3.  The Second Circuit affirmed, holding that Judge Nevas

considered all of the relevant factors and that Giordano's thirty-seven year sentence was not

substantively unreasonable.[9]  *United States v. Giordano*, 340 F. App'x 751, 753 (2d Cir. 2009).

*Id.*  Having litigated and lost on direct appeal, Giordano cannot challenge the reasonableness of

his sentence on habeas review.  *E.g.*, *Becker*, 502 F.3d at 127.

---

[9] The Second Circuit disagreed with Judge Nevas's conclusion that Giordano's arguments at resentencing involved
circumstances different than those that existed at the time of sentencing.  *See id.* That error was harmless, however,
because the government's section 5K1.1 motion effectively rendered the Sentencing Guidelines advisory at the time
of Giordano's original sentencing.  *Giordano*, 340 F. App'x at 753.  Thus, Judge Nevas was never barred from
considering various mitigating factors due to the then-mandatory nature of the Sentencing Guidelines and
considered all of the relevant arguments.  *See id.* at 753-54.

B. <u>Ineffective Assistance of Counsel Claims</u>

Giordano retained Attorney Bowman in late July 2001 and Bowman represented Giordano on both his federal and state charges through his federal trial, and on his federal charges through resentencing on the *Crosby* remand.  Bowman is an extremely experienced criminal defense lawyer with over four decades of experience.  He served as an Assistant United States Attorney and as the Federal Defender for the District of Connecticut before entering private practice.

Although neither an attorney's level of expertise nor the amount of time and energy spent on a case is sufficient to insulate that attorney from a claim of ineffective assistance of counsel, it is apparent that Bowman ably represented Giordano.  Bowman spent nearly 1,000 hours on Giordano's case, not including the direct appeal and petition for certiorari. Actions taken on Giordano's behalf prior to the trial include: (1) attacking the validity of the indictment, on both legal and factual grounds; (2) moving to suppress evidence discovered as a result of the wiretaps; (3) twice moving for recusal of Judge Nevas and appealing Judge Nevas' first denial of recusal; and (4) challenging the denial of bail.  During the trial, he twice moved for acquittal on Giordano's behalf, at the end of the government's case in chief and again at the close of the evidence, and renewed those motions after Giordano' conviction.  Finally, as discussed above, Bowman appealed Giordano's conviction and sentence on numerous grounds, and attacked Giordano's sentence again on *Crosby* remand.

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Strickland*, 466 U.S. at 690; *see also, e.g., Mills v. Scully*, 826 F.2d 1192, 1197 (2d Cir. 1987) (same).  The habeas court must independently review the evidence, *Kimmelman v. Morrison*, 477 U.S. 365, 378

(1986); however, "[j]udicial scrutiny of counsel's performance must be highly deferential," *Strickland*, 466 U.S. at 690.

"In evaluating the performance prong of an ineffective assistance claim, [courts] do not view the challenged conduct through the 'distorting' lens of hindsight but 'from counsel's perspective at the time.'" *United States v. Gaskin*, 364 F.3d 438, 469 (2d Cir. 2004) (citing *Strickland*, 466 U.S. at 689). Although ineffective assistance claims "invoke critical constitutional principles and are to be taken very seriously," they are "quite often the law's equivalent of 'buyer's remorse' or 'Monday morning quarterbacking.'" *Yick Man Mui v. United States*, 614 F.3d 50, 57 (2d Cir. 2010). It is all too tempting for a defendant to "second-guess counsel's assistance after conviction or adverse sentence," but the mere fact that the defendant was convicted does not indicate that counsel's performance was objectively unreasonable. *United States v. Simmons*, 923 F.2d 934, 956 (2d Cir. 1991).

Much of Giordano's section 2255 petition amounts to "Monday morning quarterbacking," criticizing aspects of Attorney Bowman's strategy that were sound – and often superior to any conceivable alternatives – yet did not yield the results that Giordano desired. *See Yick Man Mui*, 614 F.3d at 57. It is unsurprising that Giordano would feel aggrieved by counsel's strategy, considering that, in large part, it proved unsuccessful. Yet, "that alone is insufficient to establish his attorney's ineffectiveness." *Simmons*, 923 F.2d at 956.

Viewed in its totality, Bowman's performance far exceeded "objectively reasonable" representation. *See, e.g., Solomon v. Comm'r of Correctional Servs.*, 786 F. Supp. 218, 226 (E.D.N.Y. 1992). Moreover, generally speaking, Giordano cannot demonstrate prejudice, because the information revealed through the wiretaps, combined with the testimony of Jones and the victims, provided overwhelming evidence of Giordano's guilt. *Simmons*, 923 F.2d at

956 (denying ineffective assistance of counsel claim because, due to "plethora of evidence"

against defendant, there was "little reason to believe that alternative counsel would have fared

any better"); *United States v. O'Neil*, 118 F.3d 65, 73 (2d Cir. 1997) ("In the face of the

overwhelming evidence against him, [the defendant] cannot show that there is a reasonable

probability that, but for the alleged trial errors, the outcome of the trial would have been

different."). Nevertheless, Giordano's remaining claims of ineffective assistance of counsel are

addressed below.

### 1. *Failure to File Motions in Limine*

Defense counsel's decisions regarding what pre-trial motions to file are matters of

strategy that courts are generally reluctant to scrutinize on habeas review. *See Gaskin*, 364 F.3d

at 468. Giordano nevertheless claims that Attorney Bowman was constitutionally ineffective for

failing to file several motions in limine.

Giordano first asserts that Bowman was ineffective in failing to file a motion in limine to

preclude the admission of Jones' guilty plea and conviction and was "further derelict" in

emphasizing her guilty plea and conviction during his cross-examination of Jones. Am. Mot. to

Vacate at 7-8. According to Giordano, admission of Jones' guilty plea and conviction was

"highly prejudicial," because in an alleged conspiracy involving two participants, the guilt of one

appears to be "irrefutable evidence of the conspiracy itself," and a limiting instruction could not

(and did not) counter the prejudicial effect of such testimony. *Id.*

A motion in limine seeking to preclude admission of Jones' guilty plea and conviction

almost certainly would have been futile. Though "it is impermissible for a prosecutor to suggest

to a jury that the conviction of a testifying co-conspirator is evidence that a defendant on trial is

guilty . . . the government [may] elicit, for proper purposes and in a proper manner, an

accomplice witness' testimony regarding his conviction." *United States v. Louis*, 814 F.2d 852, 856 (2d Cir. 1987) (internal citations omitted). "Proper purposes include disclosure of matters damaging to the credibility of a witness and contradiction of any inference that the government is concealing a witness' bias." *Id.* Furthermore, the government may question a co-conspirator witness about a guilty plea if it is used to "support the reasonableness of the witness' claim to first hand knowledge." *United States v. Halbert*, 640 F.2d 1000, 1005 (9th Cir. 1981). So long as the questioning is limited in scope and the co-conspirator's guilty plea is not used as substantive evidence of defendant's guilt, the testimony is admissible. *Louis*, 814 F.2d at 856.

The admission of Jones' conviction, which resulted from her guilty plea, was used for a proper purpose. First, it provided background information regarding Jones' first-hand knowledge of Giordano's illegal conduct. Second, it served to dampen Bowman's later attempt to challenge Jones' testimony as biased in favor of the government. Both of these purposes are proper and Giordano does not point to any instance where the government attempted to suggest that Jones' guilty plea could be used as substantive evidence of Giordano's guilt. Accordingly, Bowman was not ineffective for failing to move to preclude the testimony because such an attempt would have been futile.

Even if Bowman could have succeeded on a motion to preclude Jones' testimony about her prior conviction, he was not required to bring the motion. Bowman's decision to emphasize Jones' plea and conviction on cross-examination was strategically sound, especially because she was a cooperating witness. *See United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) ("It is good practice for defense counsel to inquire into a witness's bias or motive to testify on cross-examination; such inquiries do not support a finding of prejudice under *Strickland*."). Moreover, any potential for prejudice, confusion of the issues or misleading the jury was adequately cured

by Judge Nevas' instructions to the jury to "draw no conclusions or inferences of any kind"
about Giordano's guilt from the fact that Jones pled guilty to similar charges, to not use Jones'
guilty plea as "evidence against or unfavorable to the defendant" and to examine Jones'
testimony critically, because as a cooperating witness she had a motive to testify falsely. *See*
Fed. R. Evid. 105 ("If the court admits evidence that is admissible . . . for a purpose – but not . . .
for another purpose – the court, on timely request, must restrict the evidence to its proper scope
and instruct the jury accordingly.").

    Giordano next asserts that Attorney Bowman ought to have filed a motion in limine to
preclude reference to his cooperation with the FBI's corruption investigation and the anticipated
consideration of that cooperation at sentencing. Am. Mot. to Vacate at 8. He argues that
admission of such information allowed the jury to view his conviction as "inevitable." *Id.* Yet,
Giordano provides no grounds for excluding the relevant information and, more importantly, no
explanation for why it would have made his conviction appear "inevitable." Law-abiding
citizens regularly cooperate with authorities and the substance of the information provided by
Giordano had no bearing whatsoever on the charges of sexual abuse. Furthermore, it is possible
that Bowman wanted the jury to know about Giordano's cooperation. After all, the jury could
have viewed Giordano's cooperation with the government in a positive light. The notion that
Giordano was helping the government investigate public corruption might give the jury the
impression that Giordano was not the monster that the government was portraying him to be.

    Finally, the jury was capable of comprehending that Giordano's cooperation might play a
role at sentencing in the event of his conviction, without transforming that possibility into an
"inevitable" guilty verdict. It was therefore objectively reasonable for Bowman not to file a
motion in limine related to Giordano's cooperation.

Finally, Giordano asserts that Bowman should have filed a motion in limine to "preclude the introduction of evidence discussing the warrant process, to wit, the authorization by the court approving the searches."  Am. Mot. to Vacate at 10.  That evidence allegedly prejudiced Giordano by vouching for the credibility of the affiant, Agent Reiner, who then testified to factual matters in dispute at the trial.  *Id.*  Giordano cites no case indicating that the admission of such information is improper, much less grounds for a claim of ineffective assistance of counsel.  Furthermore, Bowman fulfilled his duties as Giordano's counsel by effectively cross-examining Agent Reiner regarding the warrant process.

Even if evidence of the warrant process was inadmissible, Giordano does not establish that he was prejudiced by its admission.  The testimony regarding the warrant process played a minor role in the trial and was not necessary to securing Giordano's conviction.  Giordano was unharmed by any alleged vouching for Agent Reiner's credibility because Agent Reiner's credibility was never in question.

### 2. *Failure to Communicate Plea Offer*

Giordano next asserts that Attorney Bowman failed to communicate a plea offer that Giordano would have accepted instead of proceeding to trial.  Giordano's section 2255 petition includes a copy of a letter from defense counsel to Giordano, which Giordano claims he never received and did not know the contents of prior to filing his habeas petition.  Am. Mot. to Vacate at 8 and Ex. 2; *see also* Bowman Aff. Ex. B, *Giordano v. United States*, No. 3:11-cv-9 (SRU), ECF No. 130-1.  The letter, dated February 27, 2003, states that the government previously offered Giordano a plea deal with a fifteen-year sentencing cap and that the State of Connecticut was currently offering Giordano a plea deal with an eighteen-year cap.  Defense counsel signed the letter; Giordano did not.  Bowman also initialed and dated the letter, noting that he gave it to

Giordano, but that Giordano refused to sign.  *Id.*

It is well settled that counsel must always communicate to the defendant the terms of any plea offer from the prosecution.  *Missouri v. Frye*, 132 S. Ct. 1399, 1408 (2012); *Cullen v. United States*, 194 F.3d 401, 404 (2d Cir. 1999).  "Defense counsel have a constitutional duty to give their clients professional advice on the crucial decision of whether to accept a plea offer from the government" and the failure to communicate a plea offer falls below "an objective standard of reasonableness" under the first prong of Strickland.  *Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003); *Cullen*, 194 F.3d at 403.

The failure to communicate a plea offer is prejudicial if there is a reasonable probability that the defendant would have accepted the plea agreement if he had known of its terms.  *Id.*; *see also Frye*, 132 S. Ct. at 1409.  A "significant disparity" between the sentence imposed and the sentence in the plea offer, combined with the defendant's credible statement that he would have accepted the offer, is sufficient to support a finding of prejudice.  *Pham*, 317 F.3d at 182.

In connection with the government's response to Giordano's section 2255 petition, Bowman submitted an affidavit, which addresses Giordano's contention that he failed to communicate a plea offer with a fifteen-year cap, among other things.  *See* Bowman Aff. ¶ 18. The letter is attached as an exhibit to the affidavit.  *Id.* Ex. B.  The affidavit states that Bowman read the letter to Giordano at Putnam County Jail in Carmel, New York, on February 27, 2003. *Id.* ¶ 18.

Bowman's affidavit goes into some detail about the various plea offers on the table during the pendency of Giordano's case.  The affidavit notes that Bowman had regular access to his client and spoke frequently with Giordano about all aspects of the case, including the prospect of reaching a plea agreement with both federal and state prosecutors "to avoid the risk

of a very substantial sentence in the event of a conviction after trial in each jurisdiction." *Id.* ¶ 2.
He informed Giordano that his exposure after trial on the federal charges could be as much as
life imprisonment. *Id.* ¶ 8. Giordano consistently denied having sexual contact with V1 or V2
and consistently denied using a phone to arrange a sexual liaison with either victim. *Id.* ¶ 9.

Bowman believed that if Giordano was going to plead guilty, then it was critical that he
do so pursuant to a global agreement with both federal and state authorities. Otherwise, the dual
sovereignty exception to the Constitution's protections against Double Jeopardy would permit
any judicial admission in the federal case – including a guilty plea – to be used against Giordano
in the state sexual assault proceedings. He explained that to Giordano on numerous occasions,
but also explained that Giordano could not plead guilty to the federal charges while maintaining
his innocence, because Judge Nevas would not accept an *Alford* plea. *Id.* ¶ 7, 10. As a lawyer,
Giordano had no trouble grasping these concepts. *Id.* ¶ 10. Giordano authorized Bowman to
speak with state and federal authorities regarding a plea agreement, which Bowman did. *Id.* ¶ 7.

The affidavit describes various meetings Bowman had with federal and state authorities.
Bowman and Giordano met with the government at the United States Courthouse in New Haven
on November 20, 2001 and January 10, 2002. At those meetings, the government expressed a
willingness to agree to a Rule 11(c)(1)(C) plea. *Id.* ¶ 10-11. Bowman communicated the
possibility of a fifteen-year cap on the federal charges to Giordano, but Giordano rejected such a
lengthy sentence. *Id.* ¶ 11. By early March 2002, the government was willing to consider a
Sentencing Guidelines range of ten to twelve years on the federal charges and Bowman was
prepared to speak to the state's attorney and the Superior Court Judge assigned to Giordano's
state-court proceedings regarding a global resolution around the ten-year mark. *Id.* ¶ 13. He
communicated that information to Giordano, but Giordano was unwilling to plead guilty in

exchange for even a ten-year sentence.  Bowman memorialized his discussion with Giordano in a memo to file on March 3, 2002.  *Id.*  That memo is attached as an exhibit to Bowman's affidavit. *Id.* Ex. A.

On April 29, 2002, Bowman met with the Connecticut State's Attorney and the Superior Court Judge.  At that meeting, the state's attorney "maintained a hard position at 20 years concurrent with a federal sentence."  *Id.* ¶ 15.  Bowman met with the state's attorney again on January 24 and 27, 2003, in "an attempt to get some downward movement."  *Id.* ¶ 16.  Assistant United States Attorney Peter Jongbloed and the Superior Court Judge were also present at the January 27 meeting.  At that meeting, the state's attorney agreed to an eighteen-year sentence on the state charges, but refused to award credit for federal pretrial detention, which meant that Giordano would still face an approximate twenty-year term of confinement.  *Id.* ¶ 17.

Bowman orally informed Giordano about the substance of those meetings immediately after they happened.  *Id.*  He prepared the above-mentioned letter despite the fact that he had previously informed Giordano of its contents orally, because Giordano's trial was imminent and he wanted to make sure that Giordano fully comprehended his options.  *Id.* ¶ 18.  Giordano continued to maintain his innocence and would not admit to the elements of the federal charges related to V1 and V2.  *Id.*

Attorney Bowman did not have any additional meetings with the government, but he continued to speak with Giordano about the possibility of pleading guilty up until the point that Jones, V1 and V2 testified at the trial.  On March 15, 2003, Bowman spoke with Giordano regarding the need to plead guilty before Jones and the girls testified and he advised Giordano not to testify on his own behalf.  *Id.* ¶ 19.  Giordano rejected Bowman's advice on both accounts, which prompted Bowman to file a declaration under seal regarding the advice he had given to

Giordano.  *Id.*

As a final matter, the affidavit notes that a meeting between Bowman, Giordano and Giordano's family was arranged at the United States Courthouse in New Haven.  *Id.* ¶ 12.  The purpose of the meeting was to advise Giordano's family of the plea discussions under consideration.  The affidavit does not specify when the meeting occurred.  *See id.*

Bowman's affidavit was detailed and thorough and there was no reason to doubt his credibility.  Nevertheless, Giordano's sworn statement, combined with his failure to sign the letter, gave rise to the need for an evidentiary hearing.  I held an evidentiary hearing on July 24, 2015.  Bowman testified at the hearing, as did Giordano, Giordano's ex-wife, and Giordano's sister.

Bowman's testimony confirmed and elaborated upon the substance of his affidavit.  He testified that throughout his representation of Giordano, he repeatedly and consistently engaged in plea discussions with the government and the state's attorney and the Superior Court Judge.  Bowman stated that it was his practice to communicate all plea offers to clients and he was confident that he communicated the substance of every plea offer to Giordano within a day or two of his discussions with the relevant authorities.

Bowman testified that the state's attorney posed a significant impediment to resolving the charges throughout, because he was hostile toward Giordano.  According to Bowman, the state's attorney was angry and embarrassed that he had been excluded from the federal investigation and "wanted his pound of flesh."  That circumstance, combined with Giordano's persistent refusal to admit to any aspects of the sexual abuse, made it difficult to negotiate a plea agreement.

Bowman asserted that he memorialized the contents of his March 3, 2002 meeting with Giordano because it seemed like it might be a milestone in the case.  The government had been

offering fifteen years and the state wanted twenty, to run concurrent.  Bowman's understanding was that Giordano believed he should not serve more than eight to ten years in prison. Therefore, the government's openness to a ten-to-twelve-year Sentencing Guidelines range on the federal charges was much more in line with what Giordano seemed willing to accept. Bowman was encouraged, and thought that if he could get the state's attorney on board then a global resolution at ten years might be possible.  Giordano, however, would not accept ten years and the state would not budge on its position either.  Bowman thought the meeting with Giordano's family might have occurred prior to the discussions that led to the March 3, 2002 memorandum, but he could not recall.  He likewise could not recall whether the family meeting related to the threat Giordano and his family would have been under if he was required to testify as a cooperating witness.

Bowman recalled the government's letter of February 5, 2003 regarding the viability of pretrial resolution of the federal charges.  The letter, which was introduced into evidence at the evidentiary hearing, states that the government previously had offered a fifteen-year sentencing cap if Giordano agreed to plead guilty to two of the section 2425 counts – one involving each victim – along with one RICO conspiracy offense related to political corruption and one count of filing a false tax return.[10]  Evidentiary Hr'g Ex. 3, *Giordano v. United States*, No. 3:11-cv-9 (SRU), ECF No. 219 (exhibit list).  The letter notes that the parties had engaged in significant efforts to resolve the federal charges, but that it appeared Giordano would proceed to trial because he had been unable to resolve the associated state charges.  The letter was intended to serve as a "formal notice" that the government's outstanding offer (presumably, the offer for a fifteen-year cap that Giordano had not explicitly rejected) would be withdrawn at 10:00 a.m. on

---

[10] The letter also states that the government had provided an alternative offer, which Giordano rejected, that would have required him to plead guilty to the section 242 counts in lieu of the section 2425 counts.

February 10, 2003.  The government's letter does not foreclose the possibility of later plea negotiations, but warns that any subsequent offer would be on terms less favorable to Giordano. *See id.*

Bowman testified that he was sure he communicated the contents of the February 5 letter to Giordano, even though nothing in his file memorializes that conversation.  He could not recall whether the offer discussed in the letter would have required Giordano to testify as a cooperating witness in another criminal proceeding.  In any event, the February 10 deadline passed without Giordano agreeing to plead guilty.

At the evidentiary hearing, as in the February 27, 2003 letter, Bowman remained adamant that there was still a deal to be made even after the government's plea offer expired on February 10, 2003.  The government did not want V1 or V2 to testify, because children can be unpredictable witnesses and testifying would be traumatic for them.  Bowman believed that reality gave Giordano leverage and that he could have negotiated a plea deal up until the point that V1 and V2 testified at Giordano's March 2003 federal trial.  Given the damaging nature of the evidence against Giordano, Bowman believed Giordano should accept the government's fifteen-year cap, but Bowman respected Giordano's constitutional right to maintain his innocence and proceed to trial.

Bowman testified that the February 27, 2003 letter was designed to memorialize the then-present state of affairs for Giordano and to make sure he understood the position he was in before opting for trial.  Bowman decided to put things in writing in addition to communicating with his client orally, because he was concerned at that point that he was not getting through to Giordano.  He wanted written confirmation that Giordano fully comprehended the relevant information.

Bowman testified that Giordano refused to sign the letter after hearing its contents because he was "put off" by the letter and wanted nothing to do with it.  Bowman did not believe that Giordano's failure to sign the letter represented a breakdown of their relationship; it simply reflected Giordano's persistent lack of interest in taking a plea.[11]  Giordano had a constitutional right to persist in his not-guilty plea.  He consistently maintained his innocence, and Bowman respected that. According to Bowman, Giordano never said that he wanted to plead guilty.

Bowman testified that he nevertheless continued to try to negotiate a plea deal (in addition to vigorously preparing for trial), because he wanted to make sure that avenue remained open to Giordano should he change his mind.  In Bowman's opinion, Giordano did not accept a plea offer because he believed that the victims would not have the courage to testify against him at trial.  Without the testimony of the victims, Giordano thought that he could beat the charges and he therefore opted to put the government to its proof.

Giordano's recollection of the plea negotiations differed greatly from Bowman's.  In Giordano's view, the government was only interested in Giordano because they wanted to take down another individual who was a primary target of the corruption investigation.  The government sought Giordano's assistance in that regard.  V1 and V2 were of secondary concern.

Giordano testified that a plea offer from the government contemplating a ten-to-twelve-year Sentencing Guidelines range was on the table from the outset.  Under the terms of that offer, Giordano would have pleaded guilty to three counts of corruption and one sexual abuse charge for each victim.  The deal, however, also would have required Giordano to testify against the individual the government sought to indict.  That meant that the government would file a section

---

[11] Bowman testified that the only issue between Giordano and himself that was contentious enough to go to the "heart" of the attorney-client relationship was the issue whether Giordano should testify in his own defense.  As discussed in greater detail elsewhere in this opinion, Bowman thought that it was not in Giordano's best interest to go to trial and believed that Giordano could severely hurt his case by testifying.

5K1.1 motion, likely decreasing his federal sentence further.  Yet, it also meant that Giordano would have had to go into witness protection.

Giordano agreed with Bowman's testimony that the state's offer was never less than eighteen years.  Contrary to Bowman's assertions, Giordano testified that he was not averse to the idea of spending so many years in prison and could live with the stigma of being labeled a sex offender.  Giordano testified that he wanted to do what was best for his family; if that meant pleading guilty then he would have done so, but he did not want to accept a plea offer that his family was not comfortable with or that would put them in danger.  He only rejected the government's offer because he feared that if he cooperated, served his federal sentence, and then was released into state custody without any protection, he would risk retaliation from those he cooperated against, which would jeopardize his own safety and that of his family.

The purpose of the family meeting at the federal courthouse in New Haven was to determine if the plea offer made sense for the whole family.  Giordano's ex-wife Dawn and his sister Maria attended the meeting in New Haven.  Both women testified about the meeting at the evidentiary hearing and their testimony mirrored Giordano's.  Both recalled that the offer would have required Giordano to plead guilty and testify against the individual the government sought to indict in exchange for a ten-to-twelve-year sentence.  Neither was independently aware of the terms of the government's plea offer, however.  Their knowledge of the contents of the offer derived solely from what they were told at the meeting.  Both women believed that Giordano was open to pleading guilty, despite maintaining his innocence, if there was an acceptable plea offer.  At the meeting they decided, as a family, that Giordano should reject the government's offer.  Neither Dawn nor Maria knew of any other plea offer that was ever on the table.

Giordano testified that Attorney Bowman never communicated an offer for a fifteen-year

cap and that he would have communicated any such deal to his family.  Giordano asserted that he would have accepted a fifteen-year cap if it did not require him to testify against the relevant individual.  Such a deal would have eliminated all of his concerns about pleading guilty, because his family would be safe and he would not have to go to prison as someone who had cooperated against a member of a prominent criminal family.  Attorney Jongbloed, however, pointed out that Giordano did cooperate in the government's investigation into that individual and that cooperation is now a matter of public record.

Giordano denied ever being asked to sign the February 27, 2003 letter and denied being aware of its contents prior to filing his section 2255 petition.  He testified that he never would have gone to trial with Bowman as his counsel if he felt their relationship had broken down to that degree.  Giordano likewise denied ever being made aware of the government's February 5, 2003 letter.

Giordano presented a cohesive narrative, but he came across as slick and calculating, and his testimony was entirely self-serving.  In contrast, Bowman's testimony was entirely credible; Bowman presented as an honest person and a very competent attorney.  Although he could not remember the details of certain events and had not written everything down, Bowman was not defensive about his shortcomings.  He recounted the critical moments quite clearly and effectively explained Giordano's position (and the position he was in as Giordano's attorney) throughout the plea negotiations.  Giordano's case was clearly a large part of Attorney Bowman's life at the time and he appeared affected by his client's present situation – testifying, somberly, that what happened to Giordano was "tragic."

The most damaging aspect of Giordano's testimony, however, was not his demeanor, but his assertion that he would have accepted a plea offer, despite maintaining his innocence to this

day.  Giordano testified that his family came first and he would have pleaded guilty if he thought that was best for his family.  He also stated that he would have pleaded guilty to make things better for everyone involved, including the victims.  When probed, however, Giordano continued to deny that he committed sexual abuse.

Giordano acknowledged that Judge Nevas would not have accepted an *Alford* plea, but seemed to believe that he could have pleaded guilty without admitting to any sexual contact between himself and the victims.  At his trial, Giordano testified that Jones sometimes brought the girls with her and that he would leave the door open so he could watch them playing in the waiting room while Jones performed oral sex on him.  Those actions arguably could have given rise to liability under section 2425; however, given the nature of the charges, it is inconceivable that the government or Judge Nevas would have permitted Giordano to plead guilty without his admitting to the abuse.

Giordano is clearly a person who will stop at nothing to get what he wants.  His willingness to twist the truth, if not commit outright perjury, is devastating to his credibility.  I find that Attorney Bowman communicated the plea offer discussed in the February 27, 2003 letter to Giordano and that Giordano refused to sign.  I further find that Bowman communicated every plea offer, along with all other material information, to his client.  But even if he had not, Giordano cannot prevail on his ineffective assistance of counsel claim, because he was not prejudiced by Bowman's failure to communicate any plea.  The parties agree that Giordano was not offered an *Alford* plea, which would have permitted him to accept a plea agreement while maintaining his innocence.  *See North Carolina v. Alford,* 400 U.S. 25 (1970); U.S. Attorney's Manual, 9-27.440 (U.S.A.M.), 1997 WL 1944713, at *1 (Sept. 2006) (stating government's policy against entering into *Alford* plea agreements).  Giordano was aware that he "would not be

able to take an Alford plea" and knew he would have had to admit guilt in order to accept the terms of the government's plea agreement. Evidentiary Hr'g Tr. at 132. However, Giordano maintains his innocence to this day and did so under oath at the evidentiary hearing. Thus, Giordano has not demonstrated that he would have accepted any plea offer, no matter the terms.

   3.   *Denial of* Franks *Hearing*

A significant portion of Giordano's section 2255 petition is devoted to the claim that Attorney Bowman failed to adequately prepare, argue and brief his motion for a *Franks* hearing to test the validity of the affidavit supporting the government's request for a Title III wiretap.[12] Bowman submitted only a three-sentence affidavit prepared by Giordano and a newspaper article that had "very little relevance" to Giordano's claims along with the briefs in support of a *Franks* hearing. Am. Mot. to Vacate at 11. Judge Nevas denied the request for a *Franks* hearing because Giordano's brief and supporting affidavit did not establish any wrongdoing on the part of the affiant, Agent Reiner. The Second Circuit affirmed on direct appeal. Giordano now claims that he was and is entitled to a *Franks* hearing and that Bowman's failure to obtain a hearing caused him prejudice.

A "presumption of validity" attaches to a law enforcement officer's affidavit; however, "in certain circumstances a defendant is entitled to a hearing to test the veracity of the affiant's statements." *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (citing *Franks v.*

_____

[12] Giordano's section 2255 petition raises three additional challenges to the wiretaps: (1) Bowman failed to "adequately prepare, argue, and brief" the motion to suppress wire and oral interceptions before the trial court and failed to "effectively" challenge the wiretaps on appeal; (2) the use of the intercepts to procure the federal indictment violated 18 U.S.C. § 2515 and Bowman was ineffective for failing to object; and (3) it was improper to release the intercepts to state authorities before the legality of the wiretap was determined and Bowman was ineffective for failing to object to that, as well. All three claims may be dismissed out of hand. Regarding the first two, the record reflects that Bowman vigorously challenged the wiretaps on numerous grounds (including that the government violated 18 U.S.C. § 2515) both at the trial level and on appeal. *See Giordano*, 259 F. Supp. 2d at 152-55; *Giordano*, 172 F. App'x at 342-43. Regarding the third, Judge Nevas first authorized the wiretap in February 2001. Moreover, as Giordano recognizes, the Second Circuit confirmed the legality of the intercepts. Thus, Giordano was not prejudiced by any premature release of the wiretaps to the state authorities.

*Delaware*, 438 U.S. 154, 171 (1978)).  In *Franks*, the Supreme Court held that, "where a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," the Fourth Amendment requires a hearing be held at the defendant's request if the allegedly false statement is necessary to the finding of probable cause.  *Franks*, 438 U.S. at 155-56.  "Material omissions from an affidavit are governed by the same rules as false statements." *United States v. Campino*, 890 F.2d 588, 592 (2d Cir. 1989).

The defendant's attack "must be more than conclusory and must be supported by more than a mere desire to cross-examine."  *Franks*, 438 U.S. at 171.  His allegations must be accompanied by an offer of proof, "point[ing] out specifically the portion of the warrant affidavit that is claimed to be false," explaining the ways in which it is false, and furnishing "[a]ffidavits or sworn or otherwise reliable statements of witnesses," if possible.  *Id.*  If sworn statements are not provided, then "their absence [must be] satisfactorily explained."  *Id.*

Importantly, the relevant "deliberate falsity or reckless disregard" is "that of the affiant, not of any nongovernmental informant."  *Id.* at 171.  Allegations of negligence or innocent mistake on the part of the affiant do not warrant a hearing.  *Id.*  "*Franks* does not require that all statements in an affidavit be true; it simply requires that the statements be 'believed or appropriately accepted by the affiant as true.'"  *Campino*, 890 F.2d at 592 (citing *Franks*, 438 U.S. at 165).

Giordano argues that a *Franks* hearing was (and is) warranted because the government's primary confidential informant, CW-1, was biased against Giordano and had ample motive to lie.[13]  According to Giordano, CW-1 provided the government with false information about his

---

[13] Giordano also claims that the government presented the court with false information in one of its applications for extension of the wiretap, stating that it had only heard the end of a potentially incriminating conversation when it

relationship with Giordano and with false information about Giordano's involvement in the alleged corruption.  CW-1 also presented Agent Reiner with releases bearing Giordano's initials that, Giordano claims, were forged.  *See* Am. Mot. to Vacate at 13 and Exs. 6-7.

Giordano asserts that a cursory investigation by Agent Reiner, who served as the affiant for the initial Title III application and subsequent re-authorizations, would have revealed that CW-1 was not a reliable informant.  Giordano argues that the government wrongfully omitted information about CW-1's motivation to lie from the affidavit and knowingly or recklessly disregarded the truth when it stated that it had exhausted all reasonable investigative measures before applying for a Title III warrant.  Giordano also accuses the government of drafting the false releases itself, or at least of knowing about CW-1's criminal activities and therefore his unreliability.

Attorney Bowman advanced similar arguments in his brief supporting the request for a *Franks* hearing and at the January 6, 2003 hearing on the defendant's motion to suppress evidence discovered as a result of the wiretaps.  *See* Suppression Hr'g Tr. at 2-13, *United States v. Giordano*, 3:01-cr-00216 (AHN), ECF No. 158.  At the hearing, Bowman asserted that the government's wiretap affidavit contained material omissions regarding CW-1's character, portraying him as a "pristine individual" with "no prior criminal record," and also neglected to discuss CW-1's "motive to lie and to hate Philip Giordano."[14]  *Id.* at 3.  He claimed that Giordano's initials on the releases signed by CW-1 were forged and that that information was material, because CW-1's information "permeat[ed] the entire affidavit" and there would have been no probable cause to monitor Giordano's calls without it.  *Id.* at 6, 8, 20-21.  Bowman

---

had actually heard the entire conversation.  Am. Mot. to Vacate at 16.  Giordano does not identify which application included the purported false statement, so I cannot evaluate the merit of his contention.  Accordingly, the claim fails.

[14] Attorney Bowman acknowledged that CW-1 technically did not have a criminal record, but argued that that was misleading.  *Id.* at 5-7.

argued that a reasonable investigation by the government would have disclosed the relevant information so, at the very least, the government acted with reckless disregard for the truth. *See id.* at 3.

Despite the similarities between the arguments advanced by Bowman and those set forth in Giordano's section 2255 petition, Giordano claims that Bowman rendered constitutionally ineffective performance. Judge Nevas denied the request for a *Franks* hearing in part because he viewed Bowman as raising arguments at the hearing that were not included in Giordano's briefs or any supporting documents. *Id.* at 10-11, 18-20. Judge Nevas held that only the briefs, Giordano's three-sentence affidavit and the newspaper article should be considered, and those documents were insufficient establish the "substantial preliminary showing" necessary for a *Franks* hearing. *Id.* at 18.

Giordano's section 2255 petition lists several witnesses who could have testified in support of his request for a *Franks* hearing and confirmed that CW-1 was motivated to and did provide false information to Agent Reiner. In support of that assertion, Giordano points to certain documents that CW-1 provided to Agent Reiner in the course of their communications. The referenced documents were purportedly agreements between CW-1 and Giordano, in which Giordano had released CW-1 from any and all liability stemming from dealings related to Giordano's political ambitions, among other things. Giordano's initials were on the signature line of each of the releases, though Giordano claims he never signed them. Giordano's section 2255 petition includes sworn statements from three people: James Paolino and Madellaina DiBona, who might lend support to the notion that the releases were forgeries, and Pasquale Mangini, a comptroller for the City of Waterbury during Giordano's mayoralty, about whom CW-1 allegedly provided false information. Giordano faults Bowman for not making use of

47

those individuals in preparing the request for a *Franks* hearing.

The evidence presented in support of Giordano's request for a *Franks* hearing,

admittedly, was scant.  Nevertheless, Giordano has not demonstrated that Attorney Bowman's

performance was "objectively unreasonable" under the circumstances or that Giordano was

prejudiced by any ineffective assistance.  Bowman cannot be held to have provided ineffective

assistance for failing to interview or obtain an affidavit from James Paolino, because Paolino was

counseled not to speak with Bowman and Paolino would have invoked his Fifth Amendment

privilege at the hearing.  Suppression Hr'g Tr. at 21.  With respect to Mangini, it is not clear

whether Bowman considered interviewing Mangini or obtaining an affidavit from him, but there

were ample reasons to avoid getting Mangini involved.  Although Mangini could have testified

that CW-1 was untrustworthy and could have rebutted some of CW-1's statements related to

Mangini, Mangini also believed that Giordano was untrustworthy because he believed Giordano

lied to him about matters related to the subject of the government's corruption investigation.

*See, e.g.*, Mangini Dep. 58:19-61:6.

Regarding the other witnesses, Giordano makes no showing that their testimony would

have discredited the affiant, Agent Reiner, rather than the informant, CW-1.  Judge Nevas

ultimately denied Giordano's request for a *Franks* hearing because there was no evidence that

Agent Reiner knowingly or recklessly disregarded the truth.  Bowman may have failed to

effectively brief the motion, but unless Giordano can present evidence that implicates Agent

Reiner's state of mind, he cannot demonstrate prejudice.

As Judge Nevas discussed in his ruling, *Franks* does not require disclosure of all

information on any cooperating witness whose record was less than "pristine."  Suppression Hr'g

Tr. at 8-9.  Cooperating witnesses often have less than perfect records, but unless their "wart[s]"

relate to the substance of the affidavit there is no need to disclose everything known about them. *Id.* at 9.  Agent Reiner knew that CW-1 and Giordano had had a falling out, but he did not need to disclose that because he had adequate reason to credit CW-1's account.  *Id.* at 17.

First, the government was entitled to rely on the Waterbury Police Department's investigation of CW-1, which effectively exonerated CW-1 of criminal wrongdoing in connection with his activities as a member of Giordano's staff.  *See id.* at 12.  Second, there is no indication that Reiner knew or suspected that the releases were forged – and Giordano's self-serving assertions to the contrary are insufficient to undermine that conclusion.  DiBona and Paolino might have been able to convince Agent Reiner otherwise, but his failure to contact them does not evidence  "deliberate falsity," or a "reckless disregard for the truth."  *Franks*, 438 U.S. at 171.  The existence of the releases was logical under the circumstances, and it is understandable that Agent Reiner would not have wanted to risk alerting Giordano's associates to the ongoing investigation.

Third and most importantly, Agent Reiner did his due diligence, corroborating much of the information CW-1 provided, through other confidential informants and personal observation. Suppression Hr'g Tr. at 16-17.  For example, the affidavit contains statements of additional cooperating witnesses indicating that Giordano received kickbacks from Worth Construction and that towing companies had to pay Giordano to get their names on the list of towing companies that the City would use.  The affidavit also contains statements made by other individuals to CW-1 during consensually monitored calls that implicate Giordano in wrongdoing.  Finally, the affidavit lists occasions where Agent Reiner personally corroborated information provided by CW-1 regarding Giordano's relationship with the owner of Worth Construction, a primary target of the government's investigation.  *See United States v. Wagner*, 989 F.2d 69, 72-73 (2d Cir.

1993) (noting that a confidential informant's account may be deemed sufficiently reliable if "corroborated in material respects by independent evidence").

That due diligence both undermines Giordano's claims that Agent Reiner recklessly disregarded the truth and also makes Reiner's state of mind irrelevant.  Even after launching an effective attack on the affiant's credibility, a defendant is not entitled to a hearing unless the affidavit's remaining content, excluding "material that is the subject of the alleged falsity or reckless disregard," is insufficient to support a finding of probable cause.  *Franks*, 438 U.S. at 171-72.  No hearing is required if "there remains sufficient content in the warrant affidavit to support a finding of probable cause."  *Id.* at 172.  Although Agent Reiner relied heavily on CW-1, the affidavit sufficiently demonstrated probable cause even without CW-1's account.  Thus, Giordano has not demonstrated that in the absence of counsel's ineffective performance, he would have been entitled to a *Franks* hearing.[15]

### 4.  *Failure to Renew Motion to Suppress Wiretap*

Giordano also asserts that Attorney Bowman was ineffective for failing to renew his motion to suppress the wiretaps following Agent Reiner's trial testimony.  "In order to show ineffective assistance for the failure to make a suppression motion, the underlying motion must be shown to be meritorious, and there must be a reasonable probability that the verdict would have been different if the evidence had been suppressed."  *United States v. Matos*, 905 F.2d 30, 32 (2d Cir. 1990) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375-76 (1986)).  The only support Giordano provides is the somewhat cryptic assertion that "through cross-examination he

---

[15] Equally importantly, though unnecessary to discuss at length here, Giordano has not even come close to establishing that he would or could have prevailed on his challenges to the affidavit.  *Franks* only entitles the defendant to a hearing; "[w]hether he will prevail at that hearing is, of course, another issue."  438 U.S. at 172.  As Giordano well knows, since he himself corroborated it during his period of cooperation, most of the information provided by CW-1 was true.  Although statements made by Giordano during that period could not have been used to support the government's position at an evidentiary hearing, Giordano has not shown that he would have been able to discredit CW-1's account.

would have been able to glean the evidence necessary to support his claims." Am. Mot. to Vacate at 9. That does not qualify as a basis to hold that the motion would have had merit. *See United States v. DiTommaso*, 817 F.2d 201, 215 (2d Cir. 1987). Judge Nevas considered and rejected various challenges to the wiretaps and the Second Circuit affirmed the rejection on appeal. *See Giordano*, 172 F. App'x at 342. In the absence of any evidence to the contrary, there no reason to believe that a renewed motion to suppress would have been granted.

     5. *Failure to Call Character Witnesses*

     No character witnesses testified on Giordano's behalf at trial. His section 2255 petition asserts that this was due to Attorney Bowman's ineffective performance. The decision whether or not to call a particular witness or witnesses is a question of trial strategy that courts are not inclined to second-guess on habeas review. *See, e.g.*, *Luciano*, 158 F.3d at 660; *Krutikov v. United States*, 324 F. Supp. 2d 369, 371 (E.D.N.Y. 2004) (citing *Luciano*); *Ozuru v. United States*, No. 95 Civ. 2241(SJ), 1997 WL 124212, at *4 (E.D.N.Y. Mar. 11, 1997). A petitioner asserting a claim of ineffective assistance of counsel related to a failure to call character witnesses must, at minimum, "identify what witnesses should have been called, to what they could have testified," and "how their testimony would have altered the outcome of the trial." *Krutikov*, 324 F. Supp. 2d at 371.

     Giordano's section 2255 petition does not identify any potential character witnesses or the likely impact of their testimony on the outcome of the trial. He accuses Bowman of being ineffective for failing to call character witnesses, but cites only dicta in an out-of-Circuit case to support that contention. Am. Mot. to Vacate at 9 (citing *Trahan v. Estelle*, 544 F.2d 1305 (5th Cir. 1977)). Bowman's affidavit states that he and Giordano discussed whether to call an attorney to testify regarding Giordano's character, but decided not to do so because of concerns

regarding attorney-client privilege.  Bowman Aff. ¶ 23.  Bowman also followed up with other

prospective character witnesses, but "received from each person a rejection of our request."  *Id.*

Understandably, Bowman was not inclined to compel any character witness to testify against his

or her wishes.  *See id.*  That decision was objectively reasonable.  As Bowman recognized, the

government's cross-examination of an unwilling character witness almost certainly would have

been detrimental to Giordano's defense.  *Id.*

Undeterred, Giordano's reply brief contains affidavits from two individuals who attest to

having known Giordano at the time and having been aware he was arrested.  Both witnesses state

that would have been willing to testify as character witnesses, but were never contacted.  Pet'r's

Reply Exs. I & J, *Giordano v. United States*, No. 3:11-cv-9 (SRU), ECF No. 145/147.[16]  Neither

the affidavits nor Giordano's brief indicates that Attorney Bowman knew of the existence of

those individuals or their willingness to testify.  Moreover, there is no mention whatsoever of the

nature, scope or potential impact of their hypothetical testimony.  Without such crucial

information, Giordano cannot prevail on his claim of ineffective assistance of counsel.[17]

*Krutikov*, 324 F. Supp. 2d at 371.

### 6.  *Failure to Prepare Witnesses*

Giordano asserts that Attorney Bowman failed to prepare Giordano and defense witness

Vicky Mullen for their testimony and that all defense witnesses appeared unprepared for cross-

examination.  Am. Mot. to Vacate at 9 (citing Trial Tr. at 1557-58).  Regarding Vicky Mullen, it

is true that she became visibly upset during cross-examination.  That, however, does not appear

to have been caused by a lack of preparation.  It was due instead to the fact that she was a

---

[16] ECF No. 145 is Giordano's redacted Reply and ECF No. 147 is the un-redacted version filed under seal.

[17] Giordano's section 2255 petition also contains a general assertion that counsel failed to investigate and present witnesses whose testimony would have had a material outcome on the verdict.  Am. Mot. to Vacate at 20.  To the extent that allegation differs from Giordano's claim regarding the failure to call character witnesses, it fails for lack of support.

relative of both victims and the government insinuated that she was aware of the abuse. *See* Bowman Aff. ¶ 25.

During cross-examination, Attorney Jongbloed repeatedly asked questions that presumed Mullen was complicit in Giordano's abuse of her family members. Trial Tr. at 1548-56. Jongbloed capped this colloquy off by asking Mullen, "you failed as her care-giver, didn't you?" *Id.* at 1556. Mullen was understandably upset at the notion that she would have allowed such terrible things to happen to her family members. *Id.* at 1557 ("I'm not answering that. I'm not answering that filth. That's filthy."). Bowman cannot be held constitutionally ineffective because a witness' emotions got the better of her while testifying at trial.

Nor was Bowman ineffective for failing to prepare Mullen before her testimony. Bowman made a point of informing the jury that he and Mullen had never met before. Trial Tr. at 1557-58. That was very likely a strategic decision. It had the effect of informing the jury that Mullen was not a coached witness. Rather, it showed that Mullen was there simply to tell the truth and expose the fact that the V1 had made statements inconsistent with V1's trial testimony. *Id.* at 1523.

With respect to Giordano, Bowman appears to have done everything in his power to prevent Giordano from self-destructing in the manner that occurred at trial. Giordano's decision to take the stand was his alone, and it was taken against the advice of counsel. As Giordano acknowledges, he and Bowman thoroughly disagreed about whether he should testify. Bowman thought that it was not in Giordano's best interest to go to trial at all and believed that Giordano could severely hurt his case by testifying. He advised Giordano not to testify, but Giordano was adamant. *See* Bowman Aff. ¶ 21; Evidentiary Hr'g Tr. at 18-19, *Giordano v. United States*, No. 3:11-cv-9 (SRU), ECF No. 225. The issue became so contentious that Bowman felt compelled

to file a declaration, under seal (and in anticipation of section 2255 proceedings), memorializing the advice he had given his client. *See* Bowman Aff. ¶ 21; Evidentiary Hr'g Tr. at 17-19.

Once Giordano took the stand, Bowman attempted to limit the scope of his testimony. Although he asked some questions designed to "draw the sting" out of issues that might come up on cross-examination – e.g., a political controversy related to replacing the police chief[18] – Bowman's direct examination was focused and brief. Giordano himself was responsible for opening the door to cross-examination that went beyond the scope of Bowman's direct. His testimony included half-truths and outright lies that the government effectively exposed on cross-examination.

Critically, it was Giordano alone who chose to rebut the allegations of sexual abuse by testifying that watching the victims play in another room while he received oral sex from Jones gave him sexual gratification. Giordano did so against the express advice of counsel, who was concerned that such testimony would be an admission of an element of section 2425. Bowman Aff. ¶ 21. In hindsight, Giordano's ploy was a bad idea; the jury clearly did not believe Giordano and his partial admission might have helped convince the jury that he was guilty. But, Giordano's mistakes in that regard are his own; they are not attributable to ineffective performance by Bowman.

Regarding the rest of the defense witnesses, Giordano provides no support for his claims that they were unprepared. Bowman's affidavit submits that the defense witnesses called were subpoenaed to testify and that he interviewed those witnesses willing to be interviewed. Bowman Aff. ¶ 26. In the absence of any evidence to the contrary, there is no reason to believe

---

[18] Bowman's questioning regarding this affair, otherwise known as the "Flaherty Controversy," appears to be the basis for Giordano's contention that Bowman introduced irrelevant evidence of political corruption and thereby opened the door to cross-examination on this topic. Bowman's decision to question Giordano on this matter was a strategic decision, *see Luciano*, 158 F.3d at 660, and Giordano advances no explanation regarding how this caused him any prejudice.

Bowman's performance was less than capable.  Once again, a defense attorney cannot be blamed for the damaging nature of the evidence against his client and the weaknesses inherent in the witnesses prepared to testify on his client's behalf.

### 7.  *Failure to Interview Relatives of the Victims*

Giordano claims that Bowman was ineffective for failing to interview relatives of V1 and V2 to corroborate or discredit their stories.  Am. Mot. to Vacate at 10.  The decision to investigate is one that the court must assess with a "heavy measure of deference to counsel's judgments."  *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 691).  Counsel is not required "to investigate comprehensively every lead or possible defense" and is not constitutionally deficient if he fails to pursue an investigation that he has reason to believe would be fruitless or even harmful.  *See Greiner v. Wells*, 417 F.3d 305, 321 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 691).  Though it is true that Bowman failed to interview the victims' relatives, it is far from clear whether any relative would have been able to lend support to Giordano's defense.  Bowman investigated the DCF's findings, which included references to statements of the victims' various relatives.  Bowman Aff. ¶¶ 27-28.  After reading those statements, Bowman determined that pursuing a further investigation into the victims' relatives' potential testimony would be fruitless.

Giordano does not point to any relative who would have been able to provide testimony material to his defense.  The only relatives who did testify, Jones and Vicky Mullen, provided testimony that was damaging to the defendant.  An evaluation of the DCF's findings regarding V1 and V2 shows that, at best, Bowman would have been able to call a relative who would deny any knowledge about Giordano's alleged misconduct.  Such testimony would be duplicative to that of Mullen, who denied being aware of Giordano's alleged abuse and helped Bowman

highlight the fact that V1 had given inconsistent statements regarding her interactions with Giordano.  At worst, the relative could testify to being aware of Giordano's meetings with V1 and V2, further corroborating his alleged misconduct.  Regardless, because Jones regularly lied about where she was taking the girls, it is unlikely that any of the victims' other relatives could have offered material testimony that could have impacted the outcome of the case.

### 8.  *Repetitive Questioning*

Giordano asserts that Bowman improperly failed to object to the government's repetitive questioning of one of the victims, "which permitted multiple renditions of the alleged abuse to be presented to the jury."  Am. Mot. to Vacate at 9.  In its response, the government explains (and the record reflects that) "the child had to testify again because the sound system for the close [sic] circuit television did not work properly during the direct examination and the jury could not hear the testimony from the adjacent courtroom with the witness and counsel."  Gov't Resp. at 52 (citing Trial Tr. at 1066, 1067-68, 1069-71, 1082, 1089, 1092).  After the malfunction was fixed, she resumed testifying.  The prosecutor explained to the victim that she would be repeating some questions, because it was not clear that everyone heard her testimony.  *Id.* (citing Trial Tr. at 1131); *see also Giordano*, 442 F.3d at 36 n.3 (noting that the questions were repeated because the initial testimony was only partially audible).  It was not objectively unreasonable for Bowman to permit that testimony to be repeated without objection.

### 9.  *Gag order*

Giordano contends that Attorney Bowman was ineffective for failing to seek a "gag order," which was necessary due to the extensive pre-trial media coverage of his case.  Am. Mot. to Vacate at 18-19.  He claims, somewhat convolutedly, that a gag order would have provided an available remedy to support his motion to dismiss, change venue and postpone jury selection.  *Id.*

The jury that decided his case was filled with individuals who had been exposed to media reports of his case and therefore were "biased individuals" incapable of rendering an impartial verdict. *Id.* at 19.  A change in venue would have altered the composition of the jury, which would have resulted in his acquittal.  *Id.*

It is undeniable that Giordano's case received a significant amount of pre-trial publicity. Yet, it is also "well settled that pre-trial publicity, even if pervasive and concentrated, does not necessarily lead to an unfair trial."  *Solomon*, 786 F. Supp. at 229 (internal citations omitted). Moreover, a petitioner cannot prevail on a claim of ineffective assistance of counsel for failure to obtain a change of venue where the jurors selected indicate, on the record, that they are able to decide the case fairly and impartially in the original venue.  *Id.* at 227; *Pardee v. Napoli*, No. 07-CV-0292T, 2010 WL 1492372, at * 4 (W.D.N.Y. Apr. 13, 2010).

From the outset, Bowman was concerned about media coverage and sought to minimize media exposure to the case.  Judge Nevas was concerned as well, but he did not believe that a change of venue was feasible.  As a result, he granted Giordano's motion to seal the courtroom during the detention proceedings and prohibited disclosure to the public of the underlying intercepts and other information related to detention.  *See* Gov't Resp. at 74 (citing *Giordano*, 158 F. Supp. 2d at 247).  All pretrial litigation concerning the defendant's detention and litigation of the electronic surveillance orders occurred under seal.  *Id.*  Thus, as the government notes in its brief, Attorney Bowman managed to effectively keep damaging details about Giordano's alleged conduct out of the media until the trial.  *See id.*

On March 2, 2003, the Hartford Courant published an article about Jones and Giordano, which included an interview with Jones.  On March 3, 2003, Bowman filed a motion to change venue and postpone jury selection due to the media coverage, requesting that the trial be moved

to White Plains, New York.  Jury selection was held the next day, while that motion was

pending.  At the March 4, 2003 jury selection, Judge Nevas asked the prospective jurors whether

they knew about the charges against the defendant.  He then asked those prospective jurors who

responded "yes" whether they could be objective and excused the approximately thirty

individuals who indicated that they could not be objective.  *See* Gov't Resp. at 75 (citing Jury

Sel. Tr. at 21-22, *United States v. Giordano*, 3:01-cr-00216 (AHN), ECF No. 275).  Judge Nevas

also asked the jury venire whether they could follow an instruction to avoid reading, viewing or

listening to media accounts of the case, and he expressly forbid the jurors from doing so before

or during the trial.  *Id.* (citing Jury Sel. Tr. at 132, 161-62).

Judge Nevas held a hearing on the motion to change venue on March 5, 2003.  At the

hearing, he noted that Fairfield County, where the court was located, had the lowest circulation

of Hartford Courant readers of any place in the state.  *Id.* at 76 (citing Change of Venue Hr'g Tr.

at 17, *United States v. Giordano*, 3:01-cr-00216 (AHN), ECF No. 276).  Moreover, the article

had already been out for two days when the jury was selected, and he had carefully questioned

the prospective jurors regarding their knowledge of the case.  *Id.* (citing Change of Venue Hr'g

Tr. at 18).  All of the prospective jurors who expressed concerns about objectivity had been

dismissed, and the jurors empanelled were expressly prohibited from reading, viewing or

listening to any media coverage of the case.  *Id.*  As a result, Judge Nevas denied the motion.

Giordano's section 2255 petition asserts that Bowman should have requested a "gag

order" and that Judge Nevas would have granted the request if it had been made.  It also

indicates that the trial should have been held in a different venue, where the jury pool would not

have been comprised of individuals tainted by the negative media coverage.  The above

discussion, however, demonstrates that Giordano is incorrect.  Attorney Bowman sought and

obtained closure of the courtroom during the detention proceedings and also made sure that documents related to the wiretaps were filed under seal.  He also fought for a change of venue, which Judge Nevas denied.  In doing so, Judge Nevas concluded that individuals with views on the case had been effectively eliminated from the jury pool, and that the fourteen members of the jury would be able to fulfill their duties competently and impartially.  Giordano has therefore failed to demonstrate that Bowman could have obtained a "gag order" or that the media coverage influenced the jury and thereby prejudiced the outcome of the case.

   10. *V1 and V2's Therapy*

  Giordano claims that Bowman was ineffective for asking questions on cross-examination that opened the door for V1 and V2 to discuss therapy that they received following the alleged abuse.  Am. Mot. to Vacate at 9-10.  Giordano argues that the resulting testimony gave additional credence to the allegations that that he abused them.  *Id.*

  Giordano overlooks the fact that, in asking V1 and V2 about their discussions with DCF personnel following the alleged abuse, Bowman actually made their allegations of abuse seem less credible.  On cross-examination, Bowman effectively established that V2 had made statements to DCF investigators that were inconsistent with her subsequent trial testimony.  Trial Tr. at 1152-53.  Bowman highlighted the fact that V2 told investigators that she had only been to Giordano's law office once and had never been to City Hall or in Giordano's car.  *Id.* at 1152.  V2's statements were inconsistent with her trial testimony that she had been to Giordano's office multiple times and had also met Giordano in his car and at City Hall.  Bowman also asked V1 about her prior discussions with DCF investigators.  *Id.* at 1229.  In so doing, Bowman got V1 to admit that she believed the investigators "wanted to hear certain kinds of answers," and that V1 was concerned about disappointing them.  *Id.* at 1229-30.  It is clear that Bowman's discussion

of V1 and V2's post-alleged-abuse therapy sessions was a deliberate attempt to discredit their prior testimony.  Bowman succeeded in raising doubts about the victims' ability to recall the events accurately.  I will not second-guess a lawyer's deliberate trial strategy, let alone a strategy that appears to have been effective.  *See Luciano*, 158 F.3d at 660.

Even if Bowman's decision to question V1 and V2 in this manner could be deemed ineffective, it in no way prejudiced Giordano.  The government only asked V2 two questions that directly related to her therapy resulting from the alleged abuse.  Trial Tr. at 1160.  Those questions were merely attempts to rehabilitate V2's credibility that had been successfully attacked through Bowman's cross-examination.  They did not add any substance to the allegations against Giordano about which V2 had testified.

The government's inquiry into V1's therapy after the alleged abuse was similarly limited.  *Id.* at 1237-40.  Like with V2, the government only asked V1 about her discussions with DCF personnel in order to rehabilitate V1 from Bowman's cross-examination, which had served to diminish V1's credibility.  The time the government devoted to rehabilitate V1 on re-direct examination only establishes that Bowman had been effective in his attempt to discredit V1's testimony.  Accordingly, Giordano suffered no prejudice from Bowman's decision to open the door to a discussion of the victims' therapy following the alleged abuse.

11. *Challenging Witness Statements on Cross-Examination and Closing Argument*

Giordano claims that Attorney Bowman failed to effectively challenge various aspects of the government's case and failed to draw out inconsistencies in witness testimony, both on cross-examination and in his closing argument.  Am. Mot. to Vacate at 9-10.  The examples Giordano provides, however, are either factually incorrect or immaterial to the outcome of the case.  First, Giordano asserts that Bowman should have presented a medical expert to rebut the testimony

that it is possible for a man to ejaculate twice within the time frame indicated by Jones' driver during his testimony. *Id.* at 9. Giordano does not explain how such expert testimony could have impacted the outcome of the case and I fail to see how it would have. It is entirely possible to credit the driver's testimony that Giordano sexually abused the victims, even if he was mistaken about how many times Giordano ejaculated.

Second, Giordano asserts that Bowman failed to challenge the "highly prejudicial" testimony of the government's DNA expert that Jones and Giordano's DNA was found at many of the sites where Giordano allegedly abused the victims, but the victims' DNA was not. Am. Mot. to Vacate at 20-21. The government's expert testified that the lack of DNA meant either that their DNA was not present, or that it was present only in limited amounts – perhaps because Giordano withdrew from their mouths prior to ejaculation, thereby leaving behind an undetectably small amount of female DNA. Gov't Resp. at 84 (citing Trial Tr. at 1485-86). It is difficult to comprehend how that testimony was "highly prejudicial" to Giordano, because the absence of the victims' DNA at those sites would tend to exculpate, not inculpate Giordano. Bowman effectively capitalized on that fact during cross-examination, and also informed the jury that the lack of DNA provided grounds for reasonable doubt.[19] *Id.* (citing Trial Tr. at 1498-1510, 2051-56).

Third, Giordano claims that Bowman failed to point out inconsistencies in the victims' testimony, but the record indicates otherwise. During cross-examination of V1 and V2, Bowman emphasized the inconsistencies between statements they gave to DCF investigators and their testimony in court. Trial Tr. at 1152-53, 1235-36. For example, Bowman noted that V1 had been previously asked whether Giordano had any tattoos. Trial Tr. at 1235. V1 previously told

---

[19] Bowman also effectively challenged Jones' and the victims' testimony that Giordano ejaculated in his car by emphasizing the DNA expert's testimony that no semen was detected in the car. Gov't Resp. at 52 (citing Trial Tr. at 2051).

DCF investigators that Giordano did not have any tattoos, whereas she testified that Giordano

had a tattoo on his ankle.  Trial Tr. at 1236.

      In his closing argument, Bowman emphasized that one of the victims incorrectly testified

that Giordano did not have body hair.  Gov't Resp. at 52 (citing Trial Tr. at 2059).  He also

pointed out that one of the victims testified that the car in which she was sexually assaulted by

the defendant had brown vinyl seats, yet the evidence showed the car had grey fabric seats.  *Id.*

Finally, he pointed out that one of the victims testified that the defendant's bedroom was the

"colors of the rainbow", yet the evidence showed it was brown and black.  *Id.* at 53 (citing Trial

Tr. at 2056).

      The only inconsistency that Bowman failed to emphasize in closing argument was the

fact that one victim testified, incorrectly, that Giordano had a tattoo on his ankle.  The failure of

Bowman to highlight that fact during closing argument does not render his performance

ineffective—especially because he did highlight it on cross-examination.  It is possible that

Bowman made the tactical decision to highlight larger, more pronounced inconsistencies in the

victims' testimony.  It is possible that he simply forgot.  Regardless, the record is clear that he

devoted significant time in his closing argument to highlighting the inconsistencies in the

victims' testimony and to challenging their credibility.  Trial Tr. at 2056, 2059.  Accordingly, I

hold that Bowman was not ineffective in his attempt to discredit the government witnesses.

      12. *DCF Records for V1 and V2*

      Giordano claims that Attorney Bowman was "derelict" for failing to subpoena DCF

records for V1 and V2, which may have contained exculpatory information and could have been

used on cross-examination at trial.  Prior to the trial, Bowman sought access to Juvenile Court

records that included extensive findings from DCF.  *See* Bowman Aff. ¶¶ 27-28, ECF No. 130-1.

Bowman argued that the information in those records was relevant to show that the children suffered physical and sexual abuse from persons other than Giordano, that the children's trauma was not attributable to Giordano, and that the children acquired their knowledge of sexual terms and intimate parts of the body from their home life and not from Giordano.

Judge Nevas reviewed the Juvenile Court records, in camera, in accordance with Supreme Court precedent and Connecticut law.  *See Pennsylvania v. Ritchie*, 480 U.S. 39, 57-61 (1987) (defendant is entitled to in camera review by trial court of confidential child-protective services records if defendant can establish that they contain material evidence); *State v. Leduc*, 40 Conn. App. 233, 249 (1996) (defendant has due process right to in camera inspection of confidential DCF records, not in possession of prosecution, if defendant can establish that the information would be favorable to his defense).  After reviewing the records, Judge Nevas denied Giordano's request to use them at trial, finding that they contained no information that would materially impact Giordano's defense.

In his amended petition, Giordano attempts to rely on substantially the same arguments that Bowman advanced before and that were rejected by Judge Nevas.  Quizzically, Giordano attempts to challenge Bowman's effectiveness while relying on Bowman's own arguments in support of his underlying claim that the failure to obtain DCF records prejudiced his defense.

Giordano attempts to distinguish his current claims from Bowman's prior conduct by claiming that additional DCF records existed for V1 and V2 that may have contained exculpatory information not contained in the Juvenile Court file.  Giordano alleges that Bowman's failure to subpoena those records therefore interfered with Giordano's ability to confront witnesses and to put on a defense.  It is unclear, however, what records Giordano seeks that he did not have access to at the relevant time.  Judge Nevas reviewed DCF records and Giordano himself received DCF

records in connection with a related state-court proceeding.  Giordano appears to have extensive knowledge about the contents of V1 and V2's DCF files.

Even if there were DCF records that had not been reviewed by Judge Nevas, Giordano has not made an adequate showing that he was entitled to have the court undertake an in camera inspection of such documents.  *See State v. Farah*, 126 Conn. App. 437, 446, *cert. denied*, 300 Conn. 931 (2011).  In a criminal case, a defendant must make a showing that the records sought would be both material and favorable to the defense.  *Id.*  Giordano has failed to make that showing.

As discussed above, any additional evidence regarding Jones' role in bringing the girls to Giordano would not have been "exculpatory" with respect to the section 242 counts, in light of the Second Circuit's interpretation of the "color of law" element.  All of Giordano's other arguments in support of his assertion that the DCF records are favorable to his defense relate to the fact that V1 and V2 were exposed to sexual activity at an early age.  *See Sealed Petitioner's Mot. for Order – Superior Court Juvenile Matters at Waterbury and DCF at 2-4, Giordano v. United States*, No. 3:11-cv-9, ECF No. 75.  Giordano argues that the jury needed to know that the victims' trauma stemmed from their activities with their family, not from Giordano's abuse. *Id.* at 5.

Giordano's arguments falter due to Judge Nevas' prior rulings regarding the inadmissibility of such evidence.  Judge Nevas held that any evidence about the victims' other sexual experiences would not have been admissible under Rule 412(b).  That is because the exceptions under Rule 412(b) were clearly not satisfied: the evidence could not have been used to explain that a person other than the accused was the source of semen; the issue of consent is clearly irrelevant because a child could not consent to sexual activity with Giordano; and

Giordano has not made a showing that his constitutional rights would otherwise be violated by the exclusion of the victims' prior sexual experiences.  Fed. R. Evid. 412(b).  Giordano cannot avoid the fact that any evidence obtained by a successful subpoena of DCF records would have been excluded for the same reasons that Judge Nevas excluded the juvenile records that he did possess.

Giordano attempts to create an inference that Bowman was ineffective for failing to raise the issue again at trial, given that Judge Nevas allegedly indicated a willingness to reconsider his ruling.  However, Giordano mischaracterizes Judge Nevas' openness to relitigate the issue.  Judge Nevas stated that he would have only reconsidered his Rule 412 ruling if, during the direct examination of the children, something unanticipated occurred that would somehow make one of the Rule 412(b) exceptions applicable.  Giordano has not asserted any facts indicating that the victims' direct examination raised anything unanticipated that would have enabled Bowman to challenge Judge Nevas' prior ruling.  Accordingly, Bowman was not ineffective for failing to relitigate an issue that he had already raised and that had been previously rejected.

Finally, Giordano urges that this court should consider—and Bowman should have sought—DCF records related to Jones' niece, RM.  As was true regarding the DCF records of V1 and V2, Giordano has not established that the records of RM contain material evidence favorable to the defense.  The fact that RM was subject to similar alleged abuse by Giordano and Jones does not exculpate Giordano for what the jury found him guilty of doing to V1 and V2.  Giordano does not establish that the DCF records contained anything of which Bowman was not already aware.  Furthermore, Giordano does not establish that the records contained any information that would have changed Bowman's strategic decision not to call RM as a defense witness.  I will not second-guess Bowman's trial strategy regarding which witnesses he believed

would be favorable to Giordano's case.  Bowman surely cannot be faulted for failing to call a

witness who was also allegedly abused as a minor by Giordano.

It is extremely unlikely that anything in the DCF records would have exonerated

Giordano.  The fact that a victim has been abused by one individual does not exculpate his or her

other abusers.  Giordano's contention that there might be information within the records that

would have undermined the victims' credibility is pure speculation.  Acquiescing to his request

would launch a fishing expedition that would waste valuable judicial resources.  Bowman

actively advanced the same theories before Judge Nevas, who reviewed the Juvenile Court

records (which contained key DCF findings) and concluded that nothing in them tended to

exculpate Giordano.  Giordano has not established that the DCF files would have yielded a

different conclusion.  Bowman cannot be faulted for failing to subpoena those files when much if

not most of the relevant, material information he sought was contained in the records of the

Juvenile Court, and any additional information could not reasonably be expected to help

Giordano.

13. *Limiting Instructions on Impeachment Evidence*

Giordano asserts that Bowman failed to request, and Judge Nevas failed to give, limiting

instructions regarding the impeachment evidence that was introduced over Bowman's objection

during the cross-examination of Giordano.  Giordano does not specify what evidence he is

referring to or postulate what an appropriate limiting instruction would have been.  It is not the

court's responsibility to comb through the transcript in an attempt to sort out – or speculate on –

a petitioner's intended claims.  Without any supporting allegations or citations to the transcript,

Giordano has demonstrated neither that counsel's performance was "objectively unreasonable"

nor that he was prejudiced in any way by counsel's failure to request limiting instructions.

14. *Right of Allocution at Sentencing*

Giordano lastly faults Attorney Bowman for advising him not to exercise his right of allocution at sentencing.  Am. Mot. to Vacate at 23.  Giordano claims that Judge Nevas was "incensed" by the fact that Giordano did not apologize, which prejudiced Judge Nevas against Giordano.  Bowman's affidavit states that he discussed with Giordano whether Giordano should speak at sentencing and they decided that he should not, because Giordano continued to maintain his innocence and anything he said at sentencing could be used against him in the state-court proceedings.  Bowman Aff. ¶¶ 31-32.  That was an objectively reasonable course of action.

C. Newly Discovered Evidence

As a final matter, Giordano contends that newly discovered DNA evidence that he is not the father of one of the victims provides grounds for vacating his conviction.  He asserts that the government permitted Jones to testify that he was the father of one of the victims when it knew or should have known that Jones was testifying falsely.  This information prejudiced and "inflamed" the jury, which likely caused the jury to wrongly convict him of the sexual abuse. Giordano claims that his rights under the Fifth, Sixth and Eighth Amendments were violated.

I have reviewed the entirety of Jones' trial testimony and nothing in the record indicates that Jones stated or even implied that Giordano was the father of one of the victims.[20]  Trial Tr. at 373-566.  A petitioner is barred from bringing a claim on habeas review that was not properly raised on direct review unless the petitioner is able to show "cause and actual prejudice" or "actual innocence."  *See Bousley v. United States*, 523 U.S. 614, 622 (1998).  Giordano has shown neither.  Simply asserting on habeas review that the jury was "inflamed" is not sufficient

---

[20] Jones may have indicated that Giordano was the father of her son, Jaylen, by testifying that Giordano paid her $200 a month for a short period after she gave birth to Jaylen in December 1993.  Trial Tr. at 382-83.  Her testimony is far from clear on that issue, however, and the government did not pursue that line of questioning.  Regardless, it is undisputed that Jaylen is not one of the victims, who were both female.

to establish prejudice.  As discussed above, the evidence was more than sufficient to convict

Giordano on both the section 2425 and section 242 counts.  There is no indication that the jury

did not faithfully and impartially discharge its duties.

## IV. Conclusion

For the foregoing reasons, Giordano's amended section 2255 petition (doc. # 77/84) is

DENIED.  A Certificate of Appealability will not issue, because Giordano has failed to make a

"substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Giordano

has not demonstrated that "reasonable jurists could debate whether . . . the petition should have

been resolved in a different manner or that the issues presented were adequate to deserve

encouragement to proceed further."  *Rhagi v. Artuz*, 309 F.3d 103, 106 (2d Cir. 2002) (quoting

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  The clerk shall enter judgment and close the

case.

It is so ordered.

Dated at Bridgeport, Connecticut, this 2nd day of December 2015.


/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge