UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>PHILIP A. GIORDANO | No. 3:01-cr-216 (SRU) |

**ORDER**

  Philip Giordano, currently incarcerated at Yazoo City Medium Federal Correctional Institution ("Yazoo"), brings this motion pursuant to 18 U.S.C. § 3582(c)(i)(A), requesting that I reduce his sentence to time served. Giordano, first proceeding *pro se* and subsequently afforded the assistance of counsel, contends that a confluence of factors, including his health, the Covid-19 global pandemic, the harshness of his sentence, the assistance he has provided to state and federal authorities, and his record of rehabilitation while incarcerated, constitute extraordinary and compelling reasons for modifying his sentence. The government vehemently objects to sentence modification, maintaining both that Giordano has failed to identify the presence of extraordinary and compelling circumstances, and, more importantly, that sentence reduction would not comport with the factors set forth in 18 U.S.C. § 3553(a)—factors a District Court is required to consider when determining whether to reduce a particular sentence. *See* 18 U.S.C. § 3582(c)(i)(A).

  Because I agree with the government that sentence reduction at this time does not comport with the factors set forth in section 3553(a), Giordano's motion is **denied.**

**I.**  **Factual Background**

  The factual background of Giordano's arrest, conviction, and sentencing proceedings are set out in detail in the litany of opinions by this Court and the Second Circuit considering

Giordano's challenges to his sentence and conviction, and his various motions for postconviction relief, and familiarity with that background is therefore presumed.

Relevant here, Giordano's arrest and conviction stemmed from an unrelated investigation by federal authorities into suspected political corruption by city officials in Waterbury, Connecticut. *United States v. Giordano*, 442 F.3d 30, 33 (2d Cir. 2006). Giordano, who was at that time the mayor of Waterbury, was a target of the investigation. *Id.* In February 2001, the government obtained authorization from United States District Judge Alan H. Nevas, pursuant to the federal wiretap statute, 18 U.S.C. §§ 2510–2520, to intercept Giordano's phone communications. *Id.* For nearly six months—between February and July 2001—the government monitored calls to and from Giordano's cell phones. *Id.* During the course of that surveillance, the government intercepted calls between Giordano and a woman named Guitana Jones ("Jones"), the content of which suggested that Jones was facilitating Giordano's sexual abuse of two minor victims by bringing the victims to Giordano and ensuring the girls kept the abuse secret. *Id.* at 33-34.

On July 23, 2001, federal authorities approached Giordano and informed him that they had evidence of his sexual misconduct. *Id.* at 34. Giordano agreed to cooperate with the agents, and, over the course of the next 72 hours, provided information related to the original (and ongoing) investigation into political corruption in Waterbury. *Id.* Giordano was formally arrested three days later, on July 26. *Id.*

In September 2001, a federal grand jury returned a fourteen-count indictment charging Giordano with: two counts of violating the civil rights of the minor victims under color of law, in violation of 18 U.S.C. § 242; one count of conspiring with Jones to transmit knowingly the names of the two minor victims by using facilities and means of interstate commerce (to wit,

telephones), with intent to entice, encourage, offer and solicit criminal sexual activity, in violation of 18 U.S.C. §§ 371 and 2425; and eleven counts of substantive violations of section 2425, each alleging a particular transmission via telephone of the name one of the victims with intent to entice, encourage, offer and solicit illegal sexual activity. *Id.* On January 16, 2003, the grand jury returned a superseding indictment adding four additional counts of violations of section 2425. *Id.* at 35.[1]

Giordano was tried before a jury from March 12 to March 24, 2003. *Id.* During the course of the trial, the jury heard detailed testimony from the two minor victims about the abuse, and additionally heard testimony from Jones that Giordano had paid her to procure the minor victims for him. *Id.* at 35-37. Giordano was ultimately found guilty on all counts of the indictment save for one of the section 2425 counts, for which the jury returned no verdict. *Id.* at 37.

On June 13, 2003, Giordano appeared before Judge Nevas for sentencing. *Id.* at 38. During the sentencing proceeding, Judge Nevas formally adopted the findings and conclusions of the Pre-Sentence Report ("PSR"), which calculated Giordano's offense level, for purposes of the United States Sentencing Guidelines ("the Guidelines"), at 43. *United States v. Giordano*, 2007 U.S. Dist. LEXIS 56944, at *2 (D. Conn. Aug. 6, 2007). Based on that offense level – the maximum possible under the Guidelines – Giordano faced a sentencing range of life imprisonment. *Id.* Although the Guidelines were binding upon District Courts at the time of Giordano's sentencing, *see United States v. Booker,* 543 U.S. 220 (2005), Judge Nevas granted the government's section 5K1.1 motion, which was based on Giordano's initial cooperation with the Government. *Id.* Judge Nevas then departed downwards from the sentencing range prescribed

---

[1] Giordano was additionally charged in state court with sexual assault, after federal authorities shared information about the alleged sexual abuse of the two minor victims with state authorities. *Giordano v. United States*, 2015 U.S. Dist. LEXIS 161431, at *8 (D. Conn. Dec. 2, 2015).

by the Guidelines, and ultimately imposed a sentence of 444 months' imprisonment on counts one and two, and 60 months on each of the remaining counts, all to be served concurrently, followed by five years' supervised release. *Id.*

In 2006, the Second Circuit affirmed Giordano's conviction and sentence by published decision and unpublished order. *See United States v. Giordano*, 442 F.3d 30 (2d Cir. 2006); *United States v. Giordano*, 172 F. App'x 340 (2d Cir. 2006). Subsequently, the Court remanded the case pursuant to *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), directing Judge Nevas to determine whether he would have imposed a "materially different sentence under the circumstances existing at the time of the original sentence" had the Guidelines been advisory at the time of Giordano's sentencing. *Giordano*, 2007 U.S. Dist. LEXIS 56944 at *4. Judge Nevas conducted a hearing, *see* Doc. No. 325, took the matter under consideration, and ultimately ruled, by written order, that "the sentence imposed on Giordano would have been the same as originally imposed" had the Guidelines been merely advisory. *Id.* at *8. Thereafter, Giordano unsuccessfully attempted to obtain postconviction relief from this Court.

In 2020, Giordano, proceeding *pro se*, filed two motions for compassionate release. The government filed a brief in opposition to Giordano's motion, and I appointed counsel to represent Giordano. Thereafter, counsel filed a reply to the government's opposition, and submitted medical records and other exhibits in support of Giordano's motion, including a number of character letters and records from the BOP certifying the classes and programming Giordano has participated in while incarcerated.[2]

**II.      Standard of Review**

---

[2] Although Giordano is represented by counsel, he has continued to file replies and updates *pro se* directly with this Court, most recently in March 2022. I have reviewed those filings in addition to those submitted by counsel.

Prior to 2018, the Bureau of Prisons ("BOP") retained the exclusive authority to file a motion for sentence reduction (or "compassionate release") under section 3582. *See* 18 U.S.C. § 3582(c)(1)(A) (2017). If the BOP Director elected to file such a motion, a district court could "reduce [a] term of imprisonment" if the court found that "extraordinary and compelling reasons warrant[ed] such a reduction." *Id.* The statute itself did not explicitly define the phrase "extraordinary and compelling reasons"; instead, pursuant to 28 U.S.C. § 994(t), the Sentencing Commission was tasked with promulgating a definition, including "the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t).

The Commission ultimately did so in Guideline Section 1B1.13. That section provides that "upon motion of the Director of the Bureau of Prisons," a court may reduce a sentence under Section 3582 if "extraordinary and compelling reasons warrant the reduction" and "the defendant is not a danger to the safety...of the community." U.S.S.G. § 1B1.13(2). The application notes accompanying that section enumerate the limited circumstances that meet the Guidelines definition of "extraordinary and compelling," including:

> (A) Medical Condition of the Defendant.
> > (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
> > (ii) The defendant is—
> > > (I) suffering from a serious physical or medical condition,
> > > (II) suffering from a serious functional or cognitive impairment, or
> > > (III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
> 
> …
> (C) Family Circumstances.
> > (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

>> (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

*Id.* at n.1. Finally, application note 1(D) includes a catch-all provision, permitting a court to grant a motion under section 3582 if the Director of the BOP determines "there exists...an extraordinary and compelling reason" other than those identified. *Id.* at 1(D).

Despite BOP's "exclusive power over all avenues of compassionate release. . . BOP used [its] power sparingly." *United States v. Brooker*, 976 F.3d 228, 231 (2d Cir. 2020) (noting that, "on average, only 24 incarcerated people per year were released on BOP motion"). In 2018, with the goal of expanding access to compassionate release, Congress passed the First Step Act ("FSA"), amending section 3582 to allow defendants – rather than just the BOP – to file motions for release. *Id.* at 233. Prior to filing such a motion, however, a defendant had to exhaust "administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or demonstrate that thirty days had passed from "the receipt of such a request by the warden of the defendant's facility. . ." 18 U.S.C. § 3582(c)(1)(A)).

Although the FSA fundamentally altered the procedural mechanism governing compassionate release motions, the Sentencing Commission has yet to update section 1B1.13 to reflect those changes. *Brooker*, 976 F.3d at 233–34. As a result, section 1B1.13 and the associated application notes still define the requirements for sentence modification solely in the context of motions filed by "the Director of the Bureau of Prisons." U.S.S.G. 1B1.13; *see also Brooker*, 976 F. 3d at 234. That tension between the language of section 1B1.13 and the FSA left unclear the standard that a district court should apply when reviewing a motion brought directly by a defendant. *See id; see also United States v. Fox*, 2019 U.S. Dist. LEXIS 115388, at *4 (D. Me. July 11, 2019) (discussing the split among district courts following enactment of the FSA).

6

In particular, some courts concluded that section 1B1.13's tightly circumscribed definition of "extraordinary and compelling" circumstances limited the factors a court could consider in determining whether to grant a motion filed directly by a defendant. *Id*. Others, however, determined that section 1B1.13's definition of extraordinary and compelling circumstances applied solely to motions brought by the BOP; a court reviewing a motion brought by a defendant on her own behalf had discretion to consider a broader array of factors in determining whether to reduce a sentence. *Id.*

The Second Circuit addressed the tension between the FSA and section 1B1.13 in *Brooker*, ultimately concluding that a district court reviewing a motion brought by a defendant is free to "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *Brooker,* 976 F.3d at 237. In particular, "[n]either Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion." *Id.*

Despite the broad discretion to determine whether extraordinary and compelling circumstances are present, a district court is still required to ensure that sentence modification comports with the sentencing factors identified in section 3553(a). 18 U.S.C. § 3582(c)(1)(a); *see also United States v. Madoff*, 465 F. Supp. 3d 343, 348 (S.D.N.Y. 2020); *United States v. Mata*, 2022 U.S. Dist. LEXIS 19170, at *3 (S.D.N.Y. Feb. 2, 2022). In particular, a court must consider: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; the need for the sentence to afford deterrence to criminal conduct; the need to protect the public from further crimes of the defendant; and the need to provide the defendant with medical care or education or training. 18 U.S.C. §

3553(a)(2)(A)–(D). "The weight to be afforded any § 3553(a) factor is a matter firmly committed to the discretion of the sentencing judge." *United States v. Keitt*, 21 F. 4th 67, 72 (2d Cir. 2021) (cleaned up). On motion for compassionate release, a defendant bears the burden of establishing that sentence reduction is warranted. *Madoff*, 465 F. Supp. 3d at 349; *see also United States v. Morales*, 2020 U.S. Dist. LEXIS 151583, at *5 (D. Conn. Aug. 20, 2020).

### III.  Discussion

#### A.  Exhaustion

As amended by the FSA, section 3582 authorizes an incarcerated individual to bring a motion for compassionate after exhausting all administrative rights to appeal a failure of the BOP to bring such a motion, or after the lapse of 30 days from the filing of a motion with the warden of the defendant's facility. 18 U.S.C. § 3582(c)(1)(A); *United States v. Sturgis*, 2020 U.S. Dist. LEXIS 219102, at *9 (W.D.N.Y. Nov. 23, 2020). In the case at bar, Giordano submits that he requested compassionate release from the BOP on April 27, 2020, and that his request was denied by the Case Manager at FCI Bennettsville on May 12, 2020. Pl.'s Mem. Doc. No. 359 at 14, 42. Although noting that there is "no representation that Giordano further pursued his request or appealed the denial through the administrative remedy process," the government agrees that more than thirty days have passed since Giordano submitted the request and therefore concedes (for purposes of the instant motion) that the exhaustion requirement has been satisfied. *Id.* at 9. Accordingly, I will consider Giordano's petition on the merits.

#### B.  Section 3553(a) Factors

Given that sentence modification must comport with the factors set forth in section 3553(a), I consider those factors prior to determining whether Giordano has identified extraordinary and compelling reasons for relief. *See* 18 U.S.C. § 3582(C)(1)(A). I turn first to the

8

nature and circumstances of the offense (a factor that overlaps substantially with the "need for the sentence imposed to reflect the seriousness of the offense"). 18 U.S.C. § 3553(a)(1)-(2). The offense conduct at issue here – which involved the repeated sexual abuse of two minors – was extremely serious. *See, e.g., United States v. Irey,* 612 F.3d 1160, 1206 (11th Cir. 2010) (noting that child sex crimes are among the most serious criminal offenses for which a person can be convicted); *Kennedy v. Louisiana*, 554 U.S. 407, 435 (2008) (discussing lasting effects of childhood sexual abuse). As Judge Nevas noted at the hearing held pursuant to the *Crosby* remand, after reviewing letters sent directly by the victims, the harm that Giordano caused to both his victims was both serious and lasting. *See* Trans., Doc. No. 332 at 4-5. That Giordano "invoked the real or apparent power of his office to make the continuing sexual abuse possible," *see Giordano*, 442 F.3d at 46, renders the circumstances of the offense that much more egregious.

      Turning next to Giordano's history and characteristics, Giordano submits extensive evidence of his progress toward rehabilitation while incarcerated. In particular, Giordano provides that "since 2008 he has been programming and instructing a total of 37 classes" for other incarcerated individuals. Def.'s Mem. Doc. No. 374 at 10; *see also* Doc. No. 359 at 27 - 29 (describing Giordano's rigorous work schedule, the legal assistance he affords to other incarcerated individuals, the classes he voluntarily teaches at night, which include classes on "legal research, criminal law, constitutional law" and the programming in which he has enrolled while incarcerated); *see also* Def.'s Ex. 1-2 Doc. No. 374-1 and 374-2.

      As the government points out, however, Giordano's BOP disciplinary records include numerous infractions for a variety of offenses, most recently from 2020. *See* Govt.'s Ex. 2, Doc. No. 363-1. Although Giordano argues that those infractions do not involve particularly serious or

9

violent conduct, the litany of infractions in that record undermines Giordano's claims that he has made demonstratable progress toward rehabilitation. Additionally, although Giordano highlights his work as a law clerk while incarcerated in both his memorandum in support of release and letter to the Court, *see* Doc. No. 359 at 27-29, 55-56, Giordano concedes that he has on occasion taken money from other incarcerated individuals in exchange for those services, and has in fact been disciplined for doing so. *See* Doc. No. 370 at 14; 374 at 11; Govt.'s Mem., Doc. No. 363 at 15-16; Govt's. Ex. 2. Those repeated infractions undermine the credibility of Giordano's claims regarding his progress toward rehabilitation.[3]

Turning next to public safety, Giordano submits that at his state parole hearing, his assigned probation officer represented to the parole board that his chances of recidivism were "zero (0) percent", *see* Doc. No. 370 at 17, and that he received a similar rating on a "Recidivism Risk Assessment" administered by the BOP. *Id.* at 18; *see also* Def.'s Mem. Doc. No. 359 at 30-31, 64; *see also* Doc. No. 374 at 15-16; Doc. No. 371. That Giordano has been deemed to pose a low risk of recidivism is undoubtedly encouraging. But as the government points out, Giordano does not expressly address the conduct at issue in the underlying crimes in his litany of filings, and though he notes in passing his remorse for causing harm to his minor victims, *see, e.g.,* Doc. No. 374 at 20-21, Doc. No. 377, the bulk of his submissions address the effect of his conviction and incarceration on his own life and his own family. Though I do not discount the impact of a lengthy term of incarceration on Giordano or his loved ones, particularly during the Covid-19 pandemic, his failure to acknowledge the harm his actions caused does not jibe with his claim that he would pose no danger to the public were his sentence to be reduced to time-served. *Cf.*

---

[3] Notably, although Giordano indicates that he plans to live with his wife and family in Long Island if released, Giordano's BOP records identify a different release contact and address (at least as of March 2021). *See* Doc. No. 374-1 at 1. Although the Court attempted numerous times to contact counsel for Giordano to clarify that issue, the Court received no reply.

*United States v. Scott,* 2021 U.S. Dist. LEXIS 241584, at *12 (S.D.N.Y. Dec. 17, 2021) ("[Defendant's] own letter shows that he continues to feel genuine remorse for his past crimes and that he is committed to living a peaceful, productive life in service of others. He has demonstrated that he no longer poses a risk to public safety.").

Finally, with regard to avoiding unwarranted sentencing disparities, Giordano's sentence is undoubtedly very harsh. But this is not a situation where a pre-*Booker* mandatory Guidelines range tied the hands of a sentencing judge in considering the appropriate sentence to impose, or resulted in a sentence much more severe than might have been imposed if the Guidelines had been discretionary. *Cf. United States v. Vargas,* 502 F. Supp. 3d 820, 827 (S.D.N.Y. 2020). Instead, Judge Nevas granted the government's section 5K1.1 motion, enabling him to depart downward from the Guidelines sentencing range of life imprisonment. Moreover, Judge Nevas carefully considered Giordano's sentence not once but twice — at the time he imposed the original sentence and then again following a remand pursuant to *Crosby.* After considering the factors set forth in section 3553(a) a second time, Judge Nevas ultimately concluded that the sentence imposed was the appropriate one.

After reviewing the parties' submissions, I cannot conclude that modification of that sentence—of which Giordano has served slightly more than half—is warranted at this time. Accordingly, I need not consider whether extraordinary and compelling reasons for modification are present. *See Keitt*, 21 F.4th at 73.

V.      **CONCLUSION**

Because Giordano has failed to demonstrate that a sentence reduction at this point would comport with the factors set forth in section 3553(a), the motion is **denied.**
So ordered.

Dated at Bridgeport, Connecticut, this 12th day of August 2022.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge